## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BARCALOUNGER CORPORATION, et al.,[1] | ) | Case No. 10-_____ (___) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

## DECLARATION OF JOHN W. CHAPMAN IN SUPPORT OF CHAPTER 11
## PETITIONS AND FIRST DAY PLEADINGS

John W. Chapman, being duly sworn, deposes and says:

1. On May 19, 2010 (the "Petition Date"), Barcalounger Corporation ("Barcalounger") and American of Martinsville, Inc. ("AOM" and, together with Barcalounger, the "Debtors") each commenced a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Court"). I am the Chief Restructuring Officer of the Debtors and am familiar with the day-to-day operations, business and financial affairs of the Debtors. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1109 of the Bankruptcy Code.

2. I submit this Declaration (the "Declaration") to assist the Court and the other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the first day motions and applications filed in these cases (the "First Day Motions"). Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information provided to me by certain of the Debtors' employees, my review of relevant documents, or my opinion based upon my experience,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Barcalounger Corporation (9018); and American of Martinsville, Inc. (6836). The location of the Debtors' corporate headquarters and service address is: 128 East Church Street, Martinsville, Virginia 24112.

knowledge, and information concerning the operations and financial affairs of the Debtors. If I were called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration.

3.     This Declaration is divided into two sections. Section I provides a brief description of the Debtors' current organizational structure and operations, their current financial condition and the liquidity events giving rise to these cases. Section II sets forth those facts that are most germane to the Court's determination of the Debtors' various motions for first day relief and is intended to supplement any other declarations or affidavits submitted in direct support of such motions.

## I.
## BACKGROUND AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.     Corporate Structure

4.     Hancock Park Capital III, L.P. ("Hancock") owns 100% of the stock of Barcalounger and 100% of the stock of AOM. Thus, the Debtors are each wholly owned by Hancock.

### B.     Overview of Business Operations.

5.     Barcalounger and its iconic brand has been synonymous with quality reclining furniture for over 60 years. Each of the Barcalounger chairs it produced were made at the Debtors' facility in Martinsville, Virginia. Although Barcalounger does not sell its furniture directly to the public, it uses a series of authorized dealers located throughout the United States and Canada who sell directly to the public. Previously employing hundreds of people, Barcalounger terminated most of its employees prepetition, and ceased all operations, as a result of the dire turn in national furniture sales due, in large part, to the global economic downturn.

2

6.     AOM is a leading provider of furniture to high end luxury hotels and health care facilities. AOM uses a system of independent contractors to negotiate and contract with these hotels and health care providers to provide them with made to order furniture and fixtures. As of the Petition Date, AOM and Barcalounger collectively employed approximately 15 individuals, of which all are full-time salaried employees. Like Barcalounger, AOM ceased operations prior to the Petition Date.

7.     The primary operating expenses involved in operating the Debtors' business is wages, cost of raw material, rent, utilities, depreciation, and amortization. The Debtors' revenues are derived solely from the sale of furniture, be it to the public, in the case of Barcalounger, or to luxury hotels and health care providers, in the case of AOM. Due to the Debtors' dependence on sales revenue, declines in the purchase of furniture, especially in recessionary periods, dramatically impacted the Debtors' businesses.

C.     **Prepetition Capital Structure**

8.     On June 10, 2009, Barcalounger entered into that certain Factoring Agreement (the "Barcalounger Factoring Agreement") with Capital Business Credit LLC ("CBC" or the "Post-Petition Lenders") pursuant to which Barcalounger appointed CBC as its sole factor, and sold and assigned to CBC all of Barcalounger's Receivables (as defined in the Barcalounger Factoring Agreement) in return for a purchase price equal to the Net Invoice Amount (as defined in the Barcalounger Factoring Agreement). Pursuant to the Barcalounger Factoring Agreement, CBC could, in its sole discretion, make advances to Barcalounger against the purchase price of the receivables purchased by it at an interest rate equal to the greater of: (i) 6% per annum, and (ii) 2.75% above the Prime Rate (as defined in the Barcalounger Factoring Agreement). Barcalounger's indebtedness incurred under the Barcalounger Factoring Agreement is secured by substantially all of the assets of Barcalounger. As of the Petition Date, and assuming no accrued

3

postpetition interest, Barcalounger's outstanding obligations arising under the Barcalounger
Factoring Agreement total not less than $654,786, comprised of outstanding principal of
$651,389, accrued but unpaid interest of $3,397, and unpaid fees, costs, and expenses thereunder
in an unliquidated amount.

9. On November 11, 2009, AOM entered into that certain Factoring Agreement (the
"AOM Factoring Agreement" and, together with the Barcalounger Favoring Agreement, the
"Factoring Agreements") with CBC pursuant to which AOM appointed CBC as its sole factor,
and sold and assigned to CBC all of AOM's Receivables (as defined in the AOM Factoring
Agreement) in return for a purchase price equal to the Net Invoice Amount (as defined in the
AOM Factoring Agreement). Pursuant to the AOM Factoring Agreement, CBC could, in its sole
discretion, make advances to AOM against the purchase price of the receivables purchased by it
at an interest rate equal to the greater of: (i) 8% per annum, (ii) 3% above the Prime Rate (as
defined in the AOM Factoring Agreement), and (iii) 5% above LIBOR. AOM's indebtedness
incurred under the AOM Factoring Agreement is secured by substantially all of the assets of
AOM. As of the Petition Date, AOM's outstanding obligations arising under the AOM
Factoring Agreement total not less than $537,759, comprised of outstanding principal of
$534,337, accrued but unpaid interest of $3,421, and unpaid fees, costs, and expenses thereunder
in an unliquidated amount.

10. On November 11, 2009, AOM executed that certain Amended and Restated
Subordinated Promissory Note in favor of Hancock in the original principal amount of
$14,926,747.51 (the "AOM Note"). Interest accrues on the AOM Note at the rate of 12% per
annum and it matures on June 30, 2012. The payment of all principal, interest, and other sums
AOM owes to Hancock is junior and subordinate to the prior payment in full of, and

4

performance of all obligations in respect to, all Senior Debt (as defined in the Note) pursuant to that certain Subordination and Intercreditor Agreement (the "Barcalounger Subordination Agreement") dated November 11, 2009 among Hancock, AOM, and CBC. The indebtedness under the AOM Note is unsecured. As of the Petition Date, AOM's outstanding obligations arising under the AOM Note total not less than $19,653,073, comprised of outstanding principal of $16,361,747, accrued but unpaid interest of $3,291,326, and unpaid fees, costs, and expenses thereunder in an unliquidated amount

11.    Also on November 11, 2009, Barcalounger executed that certain Amended and Restated Subordinated Promissory Note in favor of Hancock in the original principal amount of $8,205,850 (the "Barcalounger Note" and, together with the AOM Note, the "Note"). Interest accrues on the Barcalounger Note at the rate of 12% per annum and it matures on June 30, 2012. The payment of all principal, interest, and other sums Barcalounger owes to Hancock is junior and subordinate to the prior payment in full of, and performance of all obligations in respect to, all Senior Debt (as defined in the Note) pursuant to that certain Subordination and Intercreditor Agreement (the "Barcalounger Subordination Agreement") dated November 11, 2009 among Hancock, Barcalounger, and CBC. The indebtedness under the Barcalounger Note is unsecured. As of the Petition Date, Barcalounger's outstanding obligations arising under the Barcalounger Note total not less than $12,791,160, comprised of outstanding principal of $8,730,850, accrued but unpaid interest of $4,060,310, and unpaid fees, costs, and expenses thereunder in an unliquidated amount

**D.    Events Leading To A Chapter 11 Filing**

12.    The furniture industry has seen a dramatic decline due, in part, to the global financial slowdown of recent years. The Debtors accordingly have experienced significantly lower than anticipated net operating profits for the year ended December 31, 2009, and the year

5

to date 2010 net operating profits of the Debtors have continued to be significantly below earlier projections. Due to the downturn in the economy and furniture sales in general, the Debtors have been unable to maintain adequate profits to continue as a going concern.

13.     On March 11, 2010, the Debtors hired Accretive Solutions-Detroit, Inc. ("Accretive Solutions") to assist in restructuring the Debtors' indebtedness. With the assistance of Accretive Solutions, it became clear to the Debtors that due to the decline in sales revenue industry-wide, the tightening of credit in the economy, and the overall economic downturn in the United States, the value of the Debtors had dropped dramatically. It was clear to the Debtors that the indebtedness owed under the Factoring Agreements and the Notes significantly exceeded the total fair market value of the Debtors based upon then current economic factors.

14.     The Debtors commenced negotiations on or about April 16, 2010, with CBC in order to obtain additional funding from CBC. Also on or about April 16, 2010, the Debtors, with the assistance of Accretive Solutions, continued exploring strategic alternatives and contacting third parties who may consider investing in the Debtors. The Debtors or Hancock contacted approximately 11 parties (including both financial and strategic parties) regarding a potential new investment in the Debtors in conjunction with a financial restructuring or sale transaction. The Debtors placed no conditions on potentially interested parties with regard to bid levels, structure, financing or management in connection with the solicitation of indications of interest. Six of these parties executed confidentiality agreements with the Debtors and performed due diligence. After conducting their due diligence, one party, HPC3 Furniture Holdings, LLC (the "Buyer), an affiliate of Hancock who owns all of the Debtors stock and is a significant unsecured creditor of the Debtors, expressed an interest in acquiring the Debtors' assets at a price that the Debtors' management deemed reasonable. The Buyer accordingly executed an asset purchase

6

agreement (the "Stalking Horse Agreement") to acquire all of the Debtors' assets, except for the Debtors' outstanding accounts receivable, conditioned on the Court's entry of an order authorizing the sale of the company to the Buyer and the bid procedures and bid protections reasonably acceptable to Buyer. The purchase price under the Stalking Horse Agreement is $1,500,000, and upon the closing of the sale contemplated by the Stalking Horse Agreement, Hancock will be deemed to have waived all of its $32,444,233.77 claim against the Debtors.

15.     Give their circumstances, the Debtors concluded that the relief afforded by chapter 11 of the Bankruptcy Code and an orderly auction of the Debtors' assets, with the Buyer serving as the stalking horse bidder, would help enable the Debtors to take necessary actions to protect and enhance their business and the value that will inure to their creditors, employees and other parties in interest. CBC has agreed to provide postpetition financing, on the terms and conditions of the Factoring Agreements as amended or modified by the order approving the postpetition financing in order to allow the Debtors to conduct a bidding and auction process that will culminate in an auction for the sale of substantially all of the Debtors' assets (other than Debtors' accounts receivable) on or before July 6, 2010.

## II.
## FIRST DAY PLEADINGS

16.     Concurrently with the filing of their chapter 11 cases, the Debtors will be filing a number of first day motions. The Debtors anticipate that the Court will conduct a hearing soon after the commencement of the Debtors' chapter 11 cases (the "First Day Hearing"), at which time the Court will hear the First Day Motions.

17.     Generally, the First Day Motions have been designed to meet the goals of: (a) continuing the Debtors' operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of the Debtors' customers, employees,

and certain other key constituencies; and (c) establishing procedures for the smooth and efficient administration of these cases. I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve a successful reorganization. I also believe that the matters addressed in the First Day Motions are of a genuinely emergent nature, and that the relief requested in the First Day Motions is required to preserve the assets of the Debtors' estates and to maintain the Debtors' ongoing business operations. Moreover, I believe, as further described below, that the failure to immediately address the issues set forth in the First Day Motions will have extremely adverse effects on the Debtors, their estates, and their creditors.

### A. Motion for Entry of an Order Authorizing Joint Administration of the Debtors' Related Chapter 11 Cases.

18.     Both Barcalounger and AOM have cases pending before the Court. Barcalounger and AOM are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code, and their operations are closely related. I believe that joint administration of the Barcalounger case with the AOM case is warranted and will ease the administrative burden for the Court and the parties involved with these cases.

19.     I believe that jointly administering these related cases will prevent duplication of effort and unnecessary fees, will not prejudice any party, and that it is in the best interests of the Debtors, their estates, and all creditors that the Debtors' cases be jointly administered for procedural purposes. The Debtors anticipate that numerous notices, applications, motions, hearings, and orders in these cases will affect both Barcalounger and AOM. With two debtors before the Court, each with its own case docket, the failure to administer these cases jointly would result in the filing of duplicative pleadings for each issue that arises in these cases, and the

service of each of these duplicative pleadings on separate service lists. Joint administration of these cases will eliminate these duplicative filings, reducing the waste and burden on judicial resources associated with the administration of these chapter 11 cases. Joint administration will additionally reduce the burden on the United States Trustee in supervising these chapter 11 cases.

20.    I also believe that the relief requested in this motion will not adversely affect creditors' rights, as this motion requests only administrative, and not substantive, consolidation of the Debtors' estates. For instance, creditors must still file proofs of claim against the particular Debtor's estate against whom they have claims, rather than on a consolidated basis. Indeed, the reduced costs resulting from joint administration of the Debtors' estates will enhance the rights of all creditors.

21.    Finally, in this motion, the Debtors seek authority to file the monthly operating reports required by the U.S. Trustee Operating Guidelines on a consolidated basis. I believe that consolidated monthly operating reports will further administrative economy and efficiency and will not prejudice any party in interest.

**B.    Motion for Entry of an Order (i) Authorizing the Debtors to Continue Using Their Prepetition Bank Accounts and Business Forms, (ii) Waiving the Requirements of § 11 U.S.C. § 345(b) on an Interim Basis With Respect to the Debtors' Deposit Practices, and (iii) Granting Administrative Expense Status to Postpetition Intercompany Claims**

**1.    The Debtors' Prepetition Bank Accounts.**

22.    In the ordinary course of their businesses, the Debtors maintain a number of bank accounts, which are utilized to collect funds for their operations and to pay operating and administrative expenses in connection therewith. A list of these bank accounts is attached to the motion as Exhibit A thereto (the "Bank Accounts"). The Bank Accounts currently consist of 4 bank accounts maintained with Wells Fargo Bank, 3 bank accounts with RBC Bank, and 3 bank

9

accounts with BB&T (collectively, the banks at which the Bank Accounts are maintained are the "Banks").

23. The Debtors request that none of the Banks that honors a prepetition check issued prior to the Petition Date or other item drawn on any of the Debtors' accounts that are the subject of this motion (a) at the direction of the Debtors, (b) in a good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of an innocent mistake made despite implementation of reasonable item handling procedures, be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item being honored postpetition. I believe such flexibility accorded the Banks is necessary in order to induce the Banks to continue providing banking services without additional credit exposure.

## 2. Request for Authority to Maintain Existing Bank Accounts and Continue to Use Existing Check and Business Forms.

24. The Debtors seek a waiver of the U.S. Trustee requirement that their bank accounts be closed and that new postpetition bank accounts be opened. I believe that, if enforced in these cases, such requirements would impose a burden upon the Debtors during the critical early stages of these cases as they would impair the Debtors' efforts, and the attention of their very limited staff, from successfully conducting an expedited sale of substantially all of the Debtors' assets. The Debtors' bank accounts comprise an established system that the Debtors need to maintain in order to ensure: the smooth collection of receivables, the processing and receipt of the Debtors' expected debtor-in-possession funding and the administration of disbursements made in the ordinary course of the Debtors' business. Therefore, to avoid delays in paying obligations incurred postpetition, and to ensure an efficient sales process as possible, the Debtors should be permitted to continue to maintain their existing Bank Accounts and, if necessary, to close existing accounts in the normal course of business operations. Otherwise,

10

transferring the Debtors' Bank Accounts and/or opening new postpetition bank accounts will be disruptive, time consuming and expensive in the critical days leading up to the expected expedited sale of the Debtors' assets.

25.     If the relief requested in the motion is granted, the Debtors will implement appropriate mechanisms to ensure that no payments will be made on any debts incurred by them prior to the Petition Date, other than those authorized by this Court. To prevent the possible inadvertent payment of prepetition claims, except those otherwise authorized by the Court, the Debtors will immediately advise the Banks not to honor checks issued prior to the Petition Date without further instruction from the Debtors that such checks are authorized for payment. The Debtors will work closely with the Banks to ensure appropriate procedures are in place to prevent checks issued prepetition from being honored absent this Court's approval.

26.     Local Rule 2015-2(a) provides that the Debtors may, with Court approval, continue to use their existing check and business forms without imprinting "DIP" or "Debtor-in Possession" thereon until such forms are depleted. In accordance with Local Rule 2015-2(a), the Debtors request that they be authorized to continue to use all correspondence, checks and business forms (including, but not limited to, letterhead, purchase orders, and invoices) existing immediately before the Petition Date without reference to the Debtors' status as debtors-in-possession. Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors-in-possession as a result of the notice and publicity surrounding the cases. Additionally, the Debtors simply do not have any available funds or resources to devote to purchasing replacement checks and business forms. The Debtors truly only have the resources necessary to operate for the next weeks in anticipation of the sale of substantially all of its assets.

27. I believe that to require the Debtors to revise all of their existing check and business forms would be unduly burdensome and costly, particularly when appropriate care can be taken to assure the proper usage of the existing forms and given the Debtors' intention to conduct a sale of substantially all of their assets within the next few weeks following the Petition Date.

### 3. Request that the Court Waive the Deposit Requirements of 11 U.S.C. §345(b) on an Interim Basis.

28. The Debtors request that the Court waive the requirements of section 345(b) of the Bankruptcy Code on an interim basis and permit them to maintain their deposits in their Bank Accounts in accordance with their existing deposit practices until such time as the Debtors obtain this Court's approval to deviate from the guidelines imposed under section 345(b) of the Bankruptcy Code on a final basis or as otherwise ordered by the Court. As this Motion is being filed on the first day of the Debtors' chapter 11 cases and the Debtors collectively have in excess of 200 creditors, and given the relative security of, and internal controls over, the Bank Accounts, I believe that cause exists to grant an interim forty-five (45) day waiver of the requirements of section 345(b) of the Bankruptcy Code.

### 4. Request that the Court Allow Administrative Expense Status for Intercompany Transactions.

29. In the normal course of their businesses, the Debtors engage in various intercompany transactions due to their interrelated cash administration system. As of the Petition Date, there are numerous intercompany claims (the "Intercompany Claims") that reflect intercompany receivables and payables made in the ordinary course between and among the Debtors (the "Intercompany Transactions").[2] Such receivables and payables are generally

---

[2] As the Debtors' operating structure does not include any non-Debtors, all Intercompany Transactions occur solely between the Debtors.

12

generated for, among other things, purchases of materials and products required for normal operations, miscellaneous payments by one Debtor which represent obligations of the other Debtor (e.g. tax payments, payroll, utilities), and services provided by one Debtor to another Debtor.

30. The Debtors maintain records of all Intercompany Transactions and can ascertain, trace and account for all Intercompany Transactions between and among the Debtors. Further, to ensure that each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all Intercompany Claims against a Debtor by another Debtor arising after the Petition Date as a result of Intercompany Transactions (to the extent there are any) be accorded administrative priority expense status. I believe that if all Intercompany Claims are accorded administrative priority expense status, each entity will continue to bear ultimate repayment responsibility for such ordinary course transactions.

C. **Motion for Entry of an Interim Order (i) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (ii) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (iii) Granting Liens and Superpriority Claims, (iv) Granting Adequate Protection to the Prepetition Secured Party, and (v) Scheduling a Final Hearing on the Debtors' Motion to Incur Such Financing on a Permanent Basis.**

1. **The Debtors Have an Immediate Need for Postpetition Financing.**

31. The Debtors have an immediate need for postpetition financing in order to administer these chapter 11 cases, preserve and maximize the value of the Debtors' assets and estates for the benefit of creditors, and to consummate an expedited sale of substantially all of their assets.

32. Due to the fact that virtually all of the Debtors' cash constitutes "cash collateral," and all or substantially all of its non-cash assets are subject to the prepetition liens and security

13

interests of the Lender, the Debtors are currently without sufficient unencumbered funds with which to pay ongoing operating expenses necessary to administer these chapter 11 cases. Due to the nature and magnitude of their business, the Debtors' immediate access to the proposed DIP financing and use of cash collateral is necessary in order to maintain the administration of these chapter 11 cases, maximize the value of the Debtors' available assets in the near term while they pursue a sale of substantially all of their assets, and avoid immediate and irreparable harm to their estates and creditors.

33. As a result of extensive arm's length negotiations conducted by the Debtors and the Lender (as discussed in further detail below), the Lender has agreed and consented to permit the use of Cash Collateral and provide the Debtors with the DIP Loan during the postpetition period pursuant to the terms of the DIP Financing Documents, pending the opportunity to conduct the Final Hearing.

## 2. The Debtors' Negotiation of, and Decision to Enter into, Postpetition Financing.

34. Leading up to these chapter 11 cases, the Debtors explored strategic alternatives and engaged in extensive negotiations with various parties in an effort to obtain additional liquidity. Accretive Solutions assisted the Debtors in that process. Prior to the Petition Date, Accretive contacted approximately eleven parties to gauge their interest in providing postpetition financing.

35. Given the immediacy of the Debtors' financing needs, and the liens on the Debtors' assets, none of the institutions contacted (other than the Lender) was in a position to provide debtor in possession financing that satisfied the Debtors' needs. Thus, the Debtors were unable to obtain alternative postpetition financing proposals from other lenders through credit

allowable as an administrative expense or secured by liens on the Debtors' assets junior to the liens of the Lender or on better terms than those provided by the Lender.

36.    Faced with these circumstances, and given the inability to find other postpetition financing, the Debtors engaged in good faith, arms-length negotiations with the Lender over the course of several weeks, which culminated in the DIP Loan, the Budget and the form of the Order. During the negotiations, the Debtors, with the assistance of their advisors, went to great lengths under difficult circumstances to achieve the best deal possible for themselves and their constituents. As such, the Lender made several key concessions, including, among others, the relaxation of key case milestones, and the modification and elimination of certain covenants. Without certain accommodations to the Lender such as the granting of the DIP Fee, the Post-Petition Claim, and the Post-Petition Lien, however, the Lender would not provide the postpetition DIP financing on the terms negotiated by the Debtors and described herein. Moreover, even if alternative financing was available, the DIP Lender was not agreeable to any priming facility.

37.    In this extremely challenging credit market, the Debtors have been unable to find alternative or better financing on the terms and of the type and magnitude required in these chapter 11 cases on an unsecured basis, or without offering terms substantially similar to those provided under the DIP Financing Documents. The Debtors ultimately decided that the proposal for debtor in possession financing advanced by the Lender was the most favorable under the circumstances, could be documented and accessed quickly, and adequately addressed the Debtors' reasonably foreseeable liquidity needs, while maintaining the going concern value of the Debtors' business.

**D.    Motion of the Debtors for Entry of (a) an Order Approving Bid and Notice Procedures and Bid Protections, and (b) an Order (i) Approving an Asset Purchase**

15

**Agreement Between the Debtors and the Buyer, or Such Other Purchase Agreement(s) Between the Debtors and the Successful Bidder, (ii) Authorizing the Sale of All or Substantially All of the Assets of the Debtors Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (iii) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (iv) Granting Related Relief**

38.     Prior to the Petition Date, the Debtors and their advisors extensively explored multiple restructuring alternatives, including the sale of all or specific portions of the Debtors' operations, a new debt or equity capital infusion and a comprehensive restructuring of the Debtors' balance sheet. In March, 2010, the Debtors retained Accretive Solutions-Detroit, Inc. ("Accretive Solutions") as their financial advisor to assist the Debtors' board of directors in their evaluation of strategic alternatives. At that time, the Debtors, with the help of Accretive Solutions, began to explore several strategic alternatives, including the sale of all or specific portions of the Debtors' operations, a new debt or equity capital infusion, or a comprehensive restructuring of the Debtors' balance sheet.

39.     Beginning in April, 2010, Accretive Solutions ran a marketing process for the Debtors whereby it pursued a marketing campaign on behalf of the Debtors, exploring the possibility of new money infusions or the sale of all or certain portions of the Debtors' assets. In connection with this broad marketing process, the Debtors or Hancock Park Capital III, L.P. ("Hancock") (who owns all of the equity of the Debtors and is a significant unsecured creditor of the Debtors) contacted approximately 11 parties (including both financial and strategic parties) regarding a potential new investment in the Debtors in conjunction with a financial restructuring or sale transaction.

40.     Of those parties who received due diligence materials, only HPC3 Furniture Holdings, LLC (the "Buyer"), an affiliate of Hancock, offered to purchase certain of the Debtors' assets at a price the Debtors' management deemed reasonable, and thus the Debtors and their

16

advisors began discussions with the Buyer and its advisors regarding the salient terms of an offer to purchase substantially all of the Debtor's assets.

41.     To date, the only party who expressed a willingness to provide limited incremental financing to facilitate a chapter 11 sale was Capital Business Credit LLC ("CBC" or the "Postpetition Lender"), the Debtor's prepetition secured lender. Having failed to secure financing commitments from any other parties, the Debtors commenced negotiations with the Prepetition Lenders regarding the terms of potential debtor in possession financing.

42.     Ultimately, CBC was unwilling to lend without reasonable certainty of a successful sale process and they conditioned their DIP financing commitment on the Debtors having negotiated and signed a stalking horse asset purchase agreement prior to the Petition Date. Contemporaneously herewith, the Debtors have sought entry of orders approving a postpetition financing package offered by the Prepetition Lender (the "Proposed DIP Financing"). Among other things, the Proposed DIP Financing requires that (a) an auction of the Debtors' assets occur no later than July 6, 2010, and (b) a hearing (the "Sale Hearing") at which the Debtors will seek approval of the Transaction (as defined below) with the Successful Bidder must occur on or before July 9, 2010. The Debtors have accordingly negotiated the Bid Procedures (as defined below) with the Proposed DIP Lender and the Buyer in order to facilitate an auction process that culminates in a Sale Hearing on or before July 9, 2010.

43.     The primary purpose of the sale process will be to provide for the sale (a "Transaction") involving substantially all of the Debtors' assets and operations, except for outstanding accounts receivables owed to the Debtors (the "Acquired Assets") to the party that submits the highest and best offer in accordance with the Bid Procedures.

44.    As described above, the Debtors have been in extensive negotiations with the

Buyer regarding the terms of a possible acquisition. These negotiations culminated in the

execution of a stalking horse purchase agreement (the "Stalking Horse Agreement") substantially

in the form attached this motion as Exhibit A with the Buyer. The Stalking Horse Agreement

provides that the Buyer will pay $1.5 million for the Acquired Assets and, upon the closing of

the sale to the Buyer, Hancock will be deemed to have waived its $33,055,284 claim against the

Debtors. The Debtors believe that, subject to the receipt of higher and better proposals through

the Bid Procedures, the Stalking Horse Agreement represents the best alternative currently

available to the Debtors.

45.    The Bid Procedures were developed to permit an expedited sale process, to

promote participation and active bidding, and to ensure that the Debtors receive the highest and

best offer for the Acquired Assets. Given the Debtors' precarious cash position, the Debtors

believe that the timeline for consuming the sale process established pursuant to the Bid

Procedures is in the best interests of their estates and all parties in interest.

46.    The Bid Procedures describe, among other things, the requirements for

prospective purchasers to participate in the bidding process, the availability and conduct of due

diligence, the deadline requirements for submitting a competing bid, the method and factors for

determining qualifying bids, the criteria for selecting a successful bidder, and the Expense

Reimbursement.

47.    The Expense Reimbursement is a material inducement for, and condition of, the

Buyer's agreement to enter into the Stalking Horse Agreement. As described in detail below, the

Debtors believe that the Expense Reimbursement is fair and reasonable and will enhance the

prospects for competitive bidding with respect to the Acquired Assets.

18

48.    The Debtors seek to sell the Acquired Assets through a sale and Auction. The

Debtors and Accretive Solutions have already conducted a prepetition marketing process.

Moreover, the Debtors have developed a list of Contact Parties who will receive a copy of the

Information Package. The list of Contact Parties was specifically designed to encompass those

parties who the Debtors believe may be potentially interested in pursuing a Transaction and who

the Debtors reasonably believe may have the financial resources to consummate a Transaction.

The Bid Procedures are designed to elicit bids from one or more parties and to encourage a

robust auction of the Acquired Assets, maximizing the value for the Debtors' estates and their

creditors.

49.    The Debtors believe that the notice provisions described in the Motion are

sufficient to provide effective notice of the Bid Procedures and the Auction to potentially

interested parties in a manner designed to maximize the chance of obtaining the broadest

possible participation in the Debtors' marketing process, while minimizing costs to the estates.

50.    The Debtors believe that the Bid Procedures will establish the parameters under

which the value of the Transaction may be tested at the Auction. The Bid Procedures will

increase the likelihood that the Debtors will receive the greatest possible consideration because

they will ensure a competitive and fair bidding process.

51.    The Debtors also believe that the Bid Procedures will promote active bidding

from seriously interested parties and will dispel any doubt as to the best and highest offer

reasonably available for the Acquired Assets. The Bid Procedures will allow the Debtors to

conduct the Auction in a controlled, fair and open fashion that will encourage participation by

financially capable bidders who demonstrate the ability to close a Transaction. The Debtors

believe that the Bid Procedures will encourage bidding, that they are consistent with other

procedures previously approved by courts in this and other districts and that the Bid Procedures are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

52. The Debtors believe that the Initial Minimum Overbid is reasonable under the circumstances, and will enable the Debtors to maximize the value for such assets while limiting any chilling effect in the marketing process.

53. The Expense Reimbursement was negotiated at arms' length and in good faith and is necessary to secure the Buyer's participation in the Debtors' sale process. Without the Buyer's participation as a stalking horse bidder, the Debtors would be unable to secure the Proposed DIP Financing. The Debtors have determined that pursuing the Transaction is in the best interests of the Debtors, their creditors and their estates, and therefore submit that agreeing to the minimal Expense Reimbursement represents an appropriate exercise of the Debtors' business judgment.

54. The value of the Acquired Assets will be tested through the Auction pursuant to Bid Procedures. Consequently, the Debtors believe that the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means for establishing whether a fair and reasonable price is being paid.

55. the Debtors submit that the Stalking Horse Agreement or, as the case may be, a sale agreement with the Successful Bidder, will constitute the highest and best offer for the Acquired Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. As such, the Debtors' determination to sell the Acquired Assets through an Auction process and subsequently to enter into the Stalking Horse

Agreement with the Buyer or, alternatively enter into a sale agreement with the Successful Bidder, will be a valid and sound exercise of the Debtors' business judgment.

56. The Buyer and the Debtors have engaged in thorough arms' length negotiations over the terms of the Stalking Horse Agreement. Similarly, in the event someone other than the Buyer is the Successful Bidder, by the time of execution of the Agreement, the Debtors and the Successful Bidder will have engaged in thorough arms' length negotiations over the terms of the Agreement. In addition, both the Buyer and any Successful Bidder will have complied with the terms and conditions of the Bid Procedures Order.

57. Moreover, in this case, there will be absolutely no fraud or improper insider dealing of any kind. The Debtors will ensure that the Stalking Horse Agreement or, as the case may be, the Agreement does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code, and, as a result, the Buyer or any Successful Bidder should receive the protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code.

58. The Debtors' assumption and assignment of the Assigned Contracts to the Successful Bidder will meet the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. As discussed above, the transactions contemplated by the Stalking Horse Agreement will provide significant benefits to the Debtors' estates. Because the Debtors May not be able to obtain the benefits of the Stalking Horse Agreement or, as the case may be, an agreement with the Successful Bidder, without the assumption of the Assigned Contracts, the assumption of these Assigned Contracts is undoubtedly a sound exercise of the Debtors' business judgment.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on May 19, 2010

By: /s/ John W. Chapman
Name: John W. Chapman
Title: Chief Restructuring Officer