| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BARCALOUNGER CORPORATION, et al.,[1] | ) | Case No. 10-_____ (___) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

**MOTION OF THE DEBTORS FOR ENTRY OF (A) AN ORDER APPROVING BID
AND NOTICE PROCEDURES AND BID PROTECTIONS; AND (B) AN ORDER
(I) APPROVING AN ASSET PURCHASE AGREEMENT BETWEEN THE DEBTORS
AND THE BUYER, OR SUCH OTHER PURCHASE AGREEMENT(S) BETWEEN THE
DEBTORS AND THE SUCCESSFUL BIDDER; (II) AUTHORIZING THE SALE OF
ALL OR SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS FREE AND
CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS;
(III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION
THEREWITH; AND (IV) GRANTING RELATED RELIEF**

Barcalounger Corporation and American of Martinsville, Inc. (collectively, the

"Debtors"), as debtors and debtors in possession in the above-captioned cases, hereby file their

Motion of the Debtors for Entry of (a) an Order Approving Bid and Notice Procedures and Bid

Protections; and (b) an Order (i) Approving an Asset Purchase Agreement Between The Debtors

and the Buyer, or Such Other Purchase Agreement(s) Between the Debtors and the Successful

Bidder; (ii) Authorizing the Sale of All or Substantially All of the Assets of the Debtors Free and

Clear of All Liens, Claims, Encumbrances and Other Interests; (iii) Authorizing the Assumption

and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith;

and (iv) Granting Related Relief (the "Motion"). In support of this Motion, the Debtors have

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: Barcalounger Corporation (9018); and American of Martinsville, Inc. (6836). The location of the
Debtors' corporate headquarters and service address is: 128 East Church Street, Martinsville, Virginia 24112.

filed the Declaration of John W. Chapman in Support of Chapter 11 Petitions and First Day

Pleadings (the "Chapman Declaration"). In further support hereof, the Debtors respectfully state

## I.
## Jurisdiction

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157

and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases

and this Motion is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a) and 363

and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code")

and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## II.
## Background

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy

Court for the District of Delaware (the "Court") commencing the above-captioned chapter 11

cases (the "Chapter 11 Cases"). The factual background regarding the Debtors, including their

business operations, their capital and debt structure, and the events leading to the filing of these

bankruptcy cases, is set forth in detail in the Chapman Declaration, filed concurrently herewith

and fully incorporated by reference.[2]

4.      The Debtors have continued in possession of their respective properties and have

continued to operate and maintain their business as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code

5.      No trustee or examiner has been appointed in these Chapter 11 Cases, and no

committees have yet been appointed or designated.

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Chapman Declaration.

## A. The Debtors' Efforts to Sell Substantially All of Their Assets and Raise New Financing

6.  Prior to the Petition Date, the Debtors and their advisors extensively explored multiple restructuring alternatives, including the sale of all or specific portions of the Debtors' operations, a new debt or equity capital infusion and a comprehensive restructuring of the Debtors' balance sheet. In March, 2010, the Debtors retained Accretive Solutions-Detroit, Inc. ("Accretive Solutions") as their financial advisor to assist the Debtors' boards of directors in their evaluation of strategic alternatives. At that time, the Debtors, with the help of Accretive Solutions, began to explore several strategic alternatives, including the sale of all or specific portions of the Debtors' operations, a new debt or equity capital infusion, or a comprehensive restructuring of the Debtors' balance sheet.

7.  Beginning in April, 2010, Accretive Solutions ran a marketing process for the Debtors whereby it pursued a marketing campaign on behalf of the Debtors, exploring the possibility of new money infusions or the sale of all or certain portions of the Debtors' assets. In connection with this broad marketing process, the Debtors or Hancock Park Capital III, L.P. ("Hancock") (who owns all of the equity of the Debtors and is a significant unsecured creditor of the Debtors) contacted approximately 11 parties (including both financial and strategic parties) regarding a potential new investment in the Debtors in conjunction with a financial restructuring or sale transaction. Of these 11 parties, 6 executed confidentiality agreements and were provided with due diligence materials.

8.  Of those parties who received due diligence materials, only HPC3 Furniture Holdings, LLC (the "Buyer"), an affiliate of Hancock , offered to purchase certain of the Debtors' assets at a price the Debtors' management deemed reasonable, and thus the Debtors and

3

their advisors began discussions with the Buyer and its advisors regarding the salient terms of an offer to purchase substantially all of the Debtor's assets.

9. To date, the only party who expressed a willingness to provide limited incremental financing to facilitate a chapter 11 sale was Capital Business Credit LLC ("CBC" or the "Postpetition Lender"), the Debtor's prepetition secured lender. Having failed to secure financing commitments from any other parties, the Debtors commenced negotiations with the Prepetition Lenders regarding the terms of potential debtor in possession financing.

10. Ultimately, CBC was unwilling to lend without reasonable certainty of a successful sale process and they conditioned their DIP financing commitment on the Debtors having negotiated and signed a stalking horse asset purchase agreement prior to the Petition Date. Contemporaneously herewith, the Debtors have sought entry of orders approving a postpetition financing package offered by the Prepetition Lender (the "Proposed DIP Financing"). Among other things, the Proposed DIP Financing requires that (a) an auction of the Debtors' assets occur no later than July 6, 2010, and (b) a hearing (the "Sale Hearing") at which the Debtors will seek approval of the Transaction (as defined below) with the Successful Bidder must occur on or before July 9, 2010. The Debtors have accordingly negotiated the Bid Procedures (as defined below) with the Proposed DIP Lender and the Buyer in order to facilitate an auction process that culminates in a Sale Hearing on or before July 9, 2010.

11. The primary purpose of the sale process will be to provide for the sale (a "Transaction") involving substantially all of the Debtors' assets and operations, except for outstanding accounts receivables owed to the Debtors (the "Acquired Assets") to the party that submits the highest and best offer in accordance with the Bid Procedures.

4

## III.
## The Stalking Horse Agreement, Bid Procedures, Auction, and Sale

**A.     The Stalking Horse Agreement.**

12.     As described above, the Debtors have been in extensive negotiations with the

Buyer regarding the terms of a possible acquisition. These negotiations culminated in the

execution of a stalking horse purchase agreement (the "Stalking Horse Agreement") substantially

in the form attached hereto as **Exhibit A** with the Buyer. The Stalking Horse Agreement

provides that the Buyer will pay $1.5 million for the Acquired Assets and, upon the closing of

the sale to the Buyer, Hancock will be deemed to have waived its $33,055,284 claim against the

Debtors. The Debtors believe that, subject to the receipt of higher and better proposals through

the Bid Procedures, the Stalking Horse Agreement represents the best alternative currently

available to the Debtors.

**B.     The Proposed Bid Procedures and Bid Protections.[3]**

13.     The Bid Procedures, substantially in the form attached hereto as **Exhibit B**, were

developed to permit an expedited sale process, to promote participation and active bidding, and

to ensure that the Debtors receive the highest and best offer for the Acquired Assets. Given the

Debtors' precarious cash position, the Debtors believe that the timeline for consuming the sale

process established pursuant to the Bid Procedures is in the best interests of their estates and all

parties in interest.

14.     The Bid Procedures describe, among other things, the requirements for

prospective purchasers to participate in the bidding process, the availability and conduct of due

diligence, the deadline requirements for submitting a competing bid, the method and factors for

---

[3] The summary of the Bid Procedures contained in this Motion is qualified in its entirety by reference to the Bid Procedures. To the extent of any inconsistency, the Bid Procedures shall govern. Capitalized terms used but not otherwise defined in this section shall have the meanings set forth in the Bid Procedures.

CHI1 1677147v.2

determining qualifying bids, the criteria for selecting a successful bidder, and provides for the

Expense Reimbursement (as defined below) for the benefit of the Buyer.

15. The Expense Reimbursement is a material inducement for, and condition of, the

Buyer's agreement to enter into the Stalking Horse Agreement. As described in detail below, the

Debtors believe that the Expense Reimbursement is fair and reasonable and will enhance the

prospects for competitive bidding with respect to the Acquired Assets.

16. Pursuant to Local Rule 6004-1(c), a debtor filing a motion seeking approval of

bidding procedures must highlight certain provisions. The following is a summary of the

Debtors' proposed Bid Procedures in compliance with Local Rule 6004-1(c):

### (i) Qualification of Bidders (Local Rule 6004-1(c)(i)(A)).

To be eligible to participate in the Auction, each offer, solicitation or proposal
(each, a "Bid"), and each party submitting such a Bid (each, a "Bidder"), must be
determined by the Debtors to satisfy each of the following conditions:

Corporate Authority: Written evidence reasonably acceptable to the
Debtors demonstrating appropriate corporate authorization to consummate
the proposed Competing Transaction; provided, however, that, if the Bidder
is an entity specially formed for the purpose of effectuating the Competing
Transaction, then the Bidder must furnish written evidence reasonably
acceptable to the Debtors of the approval of the Competing Transaction by
the equity holder(s) of such Bidder. *See* Bid Procedures at ¶ 3(C).

Proof of Financial Ability to Perform: Written evidence that the Debtors
reasonably conclude demonstrates that the Bidder has the necessary
financial ability to close the Competing Transaction and provide adequate
assurance of future performance under all contracts to be assumed and
assigned in such Competing Transaction. Such information should include,
*inter alia*, the following:

- · contact names and numbers for verification of financing
  sources,
- · evidence of the Bidder's internal resources and proof of
  any debt or equity funding commitments that are needed to
  close the Competing Transaction;
- · the Bidder's current financial statements (audited if
  they exist); and
- · any such other form of financial disclosure or credit-quality
  support information or enhancement reasonably acceptable

6

to the Debtors demonstrating that such Bidder has the ability to close the Competing Transaction; provided, however, that the Debtors shall determine, in their reasonable discretion, in consultation with the Debtors' advisors, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Bidder's financial qualifications. *See* Bid Procedures at ¶ 3(C).

### (ii)    Qualified Bids (Local Rule 6004-1(c)(i)(B)).

Each offer, solicitation or proposal (each, a "Bid") must be determined by the Debtors to satisfy each of the following conditions

Good Faith Deposit: Each Bid must be accompanied by a deposit in the amount of $150,000 to an interest bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit") *See* Bid Procedures at ¶ 3(C).

Same or Better Terms: The Bid must be on terms that, in the Debtors' business judgment, are substantially the same or better than the terms of the Stalking Horse Agreement. A Bid must include executed transaction documents pursuant to which the Bidder proposes to effectuate the Competing Transaction (the "Competing Transaction Documents"). A Bid shall include a copy of the Stalking Horse Agreement marked to show all changes requested by the Bidder (including those related to purchase price). A Bid should propose a Competing Transaction involving substantially all of the Debtors' assets or operations, but the Debtors will consider proposals for less than substantially all of the Debtors' assets or operations, provided that the Debtors may evaluate all Bids, in their sole discretion, to determine whether such Bid maximizes the value of the Debtors' estates as a whole. A Bid must propose a purchase price equal to the purchase price under the Stalking Horse Agreement plus the full amount of the $20,000 Expense Reimbursement, plus $50,000. The Competing Transaction Documents shall also identify any executory contracts and unexpired leases of the Debtors that the Bidder wishes to have assumed and assigned to it pursuant to the Competing Transaction (collectively, the "Assigned Contracts"). *See* Bid Procedures at ¶ 3(C)

Contingencies: A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties. *See* Bid Procedures at ¶ 3(C).

Bid Deadline: Regardless of when a party qualifies as a Preliminarily Interested Investor, the Debtors must receive a Bid in writing, on or before

July 1, 2010 or such later date as may be agreed to by the Debtors (the "Bid Deadline"). *See* Bid Procedures at ¶ 3(C).

(iii) **Bid Protections (Local Rule 6004-1(c)(i)(C)).**

If the Stalking Horse Agreement is terminated pursuant to 7.1(a) or 7.1(c) thereof or because the Buyer is not the Successful Bidder at the Auction, the Buyer shall, without further court order, be entitled to receive reimbursement of the reasonable, actual, out-of-pocket costs and expenses paid or incurred by Buyer directly incident to, under, or in connection with the negotiation, execution and performance under the Stalking Horse Agreement and the transactions contemplated thereunder (including travel expenses and reasonable fees and disbursements of counsel, accountants and financial advisors, excluding any charges for the time or services of Buyer's employees) in an amount not to exceed $20,000 in the aggregate ("Expense Reimbursement"). *See* Bid Procedures at ¶ IV(G)

In the event the Stalking Horse Agreement is terminated pursuant to 7.1(a) or 7.1 (c) thereof or because the Buyer is not the Successful Bidder at the Auction, the Expense Reimbursement shall be paid immediately upon such termination from the assets of the Debtors' estate and shall have priority as an administrative expense in the Debtors' cases under section 503(b) and 507(a) of the Bankruptcy Code. In any case if the Buyer and the Debtors are unable to agree on the amount of the Expense Reimbursement, such amount shall be paid only upon a final determination by the Bankruptcy Court of the amount of the Expense Reimbursement. *See* Bid Procedures at ¶ (IV)(G).

Minimum Overbid Increment. Any Overbid after the Auction Baseline Bid shall be made in increments of at least $50,000. Additional consideration in excess of the amount set forth in the Auction Baseline Bid may include only cash, the assumption of debt, marketable securities or a credit bid under section 363(k) of the Bankruptcy Code of an allowed secured claim, and, in the case of the Buyer's Bid, a credit bid of the $20,000 Expense Reimbursement, in any combination. *See* Bid Procedures at ¶ IV(B)(1). An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the Auction Baseline Bid. *See* Bid Procedures at ¶ IV(B).

Treatment of Expense Reimbursement at Auction. The Buyer shall be permitted to credit bid the full amount of the Expense Reimbursement pursuant to any Overbid in connection with each round of bidding at the Auction. *See* Bid Procedures at ¶ IV(A).

(iv) **Modification of Bidding and Auction Procedures (Local Rule 6004-1(c)(1)(D))**

CHI1 1677147v.2

Additional Procedural Rules. The Debtors may announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time to make subsequent Overbids) for conducting the Auction so long as such rules are not inconsistent with these Bid Procedures. *See* Bid Procedures at ¶ IV(D).

### (v) Closing with Alternative Back-Up Bidders (Local Rule 6004-1(c)(i)(E)

Notwithstanding anything in the Bid Procedures to the contrary, if an Auction is conducted, the party with the next highest or otherwise best Qualified Bid at the Auction, as determined by the Debtors, in the exercise of their business judgment shall be required to serve as a backup bidder (the "Backup Bidder"). The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern time) on the date that is sixty (60) days after the date of the Auction (the "Outside Backup Date") or the closing of the transaction with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved transaction, because of a breach or failure to perform on the part of such Successful Bidder, the Debtors may designate the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the transaction, with the Backup Bidder without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder. The deposit of the Backup Bidder shall be held by the Debtors until the earlier of 24 hours after (a) the closing of the transaction with the Successful Bidder and (b) the Outside Backup Date.

## C. The Auction and Sale.

17. If more than one Qualified Bid is received by the Bid Deadline (other than the Stalking Horse Agreement), the Debtors will conduct an auction (the "Auction") to determine the highest and best Qualified Bid. This determination shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estate, including, inter alia, the following: (i) the amount and nature of the consideration; (ii) the proposed assumption of any liabilities, if any; (iii) the ability of the Qualified Bidder to close the proposed Transaction; (iv) the proposed closing date and the likelihood, extent and impact of any potential delays in closing; (v) any purchase price adjustments; (vi) the impact of the Transaction on any actual or potential litigation;

9

and (vii) the net after-tax consideration to be received by the Debtors' estates (collectively, the "Bid Assessment Criteria"). If no Qualified Bid (other than the Stalking Horse Agreement) is received by the Bid Deadline, the Debtors may determine not to conduct the Auction. The Debtors seek authority from the Court to schedule the Auction for July 6, 2010, as further described in the Bid Procedures.

## IV.
## Relief Requested

18.     The Debtors respectfully request the entry of (a) an order approving the Bid Procedures and the Bid Protections and scheduling an auction (if necessary) to sell the Acquired Assets; and (b) an order (i) approving the sale of the Acquired Assets to the Buyer or the Successful Bidder, (ii) authorizing the sale of the Acquired Assets free and clear of all Claims and Interests (as defined below) and (iii) authorizing the assumption and assignment of the Assigned Contracts (as defined in the Bid Procedures) to the Buyer or the Successful Bidder.

## V.
## Basis for Relief

### A.     The Bid Procedures Are Appropriate and in the Best Interests of the Debtors, Their Estates and Their Creditors

#### i.     The Proposed Notice of the Bid Procedures Is Appropriate

19.     The Debtors seek to sell the Acquired Assets through a sale and Auction. The Debtors and Accretive Solutions have already conducted a prepetition marketing process. Moreover, the Debtors have developed a list of Contact Parties who will receive a copy of the Information Package. The list of Contact Parties was specifically designed to encompass those parties who the Debtors believe may be potentially interested in pursuing a Transaction and who the Debtors reasonably believe may have the financial resources to consummate a Transaction. The Bid Procedures are designed to elicit bids from one or more parties and to encourage a

10

robust auction of the Acquired Assets, maximizing the value for the Debtors' estates and their creditors.

20. Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Acquired Assets, including a disclosure of the time and place of any auction, the terms and conditions of a sale, and the deadline for filing any objections.

21. Therefore, in addition to the Contact Parties, the Debtors will serve this Motion on all Notice Parties (as defined herein) and will provide notice of the hearing on this Motion to all entities who are known to possess or assert a claim against the Debtors. Moreover, the Debtors propose to publish the notice attached hereto as Exhibit C (the "Bid Procedures Notice") once in the *USA Today* within five business days after entry of the Bid Procedures Order.

22. The Debtors believe that the foregoing notice is sufficient to provide effective notice of the Bid Procedures and the Auction to potentially interested parties in a manner designed to maximize the chance of obtaining the broadest possible participation in the Debtors' marketing process, while minimizing costs to the estates. Accordingly, the Debtors respectfully request that the Court find that the proposed notice procedures set forth in this Motion are sufficient, and that no other or further notice of the Bid Procedures or the Auction is required.

**ii. The Bid Procedures Are Appropriate and Will Maximize Value**

23. Bid procedures should be approved when they provide a benefit to the debtor's estate by maximizing the value of the debtor's assets. See In re Edwards, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").

24. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See In re Mushroom Transp. Co., Inc., 382 F.3d 325, 339

11

(3d Cir. 2004) (debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"); Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003) (same); Four B. Corp. v. Food Barn Stores, Inc. (In re Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

25.     To that end, courts uniformly recognize that procedures to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. See In re O'Brien Envtl. Energy, Inc., 181 F.3d 527, 537 (3d Cir. 1999); see also Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "encourage bidding . . . maximize the value of the debtor's assets").

26.     The Debtors believe that the Bid Procedures will establish the parameters under which the value of the Transaction may be tested at the Auction. The Bid Procedures will increase the likelihood that the Debtors will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

27.     The Debtors also believe that the Bid Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the best and highest offer reasonably available for the Acquired Assets. The Bid Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a Transaction. The Debtors believe that the Bid Procedures will encourage bidding, that they are consistent with other procedures previously approved by courts in this and other districts and that the Bid Procedures are appropriate under the relevant standards governing auction proceedings and bidding

12

incentives in bankruptcy proceedings. See In re O'Brien Envtl. Energy, Inc., 181 F.3d at 537; see also In re Dura Auto. Sys., Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. July 14, 2007); In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr D. Del. Apr. 20, 2007); In re Three A's Holdings, L.L.C., Case No. 06-10886 (BLS) (Bankr. D. Del. Sept. 7, 2006).

28.     Thus, the Bid Procedures are reasonable, appropriate and within the Debtors' sound business judgment under the circumstances because the Bid Procedures are designed to maximize the value to be received by the Debtors' estates.

### iii.     The Initial and Subsequent Overbids Are Appropriate

29.     One important component of the Bid Procedures is the "overbid" provision. Once the Debtors determine the Auction Baseline Bid and hold the Auction, all subsequent Overbids must be made in increments of at least $50,000 higher than the Auction Baseline Bid (the "Initial Minimum Overbid") and then continue in minimum increments of at least $50,000; provided that the Debtors shall retain the right to modify the bid increment requirements at the Auction.

30.     The Debtors believe that such Initial Minimum Overbid is reasonable under the circumstances, and will enable the Debtors to maximize the value for such assets while limiting any chilling effect in the marketing process. The overbid increment is also consistent with such increments previously approved by courts in this District. See In re Dura Auto. Sys., Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007) (approving $750,000 increment); In re New Century TRS Holdings, Inc., Case No. 07-10416 (KJC) (Bankr D. Del. Apr. 20, 2007) (approving $500,000 increment); In re Three A's Holdings, L.L.C., Case No. 06-10886 (BLS) (Bankr D. Del. Sept. 7, 2006) (approving $500,000 increment).

### iv.     The Expense Reimbursement is Reasonable and Appropriate

31.     The Expense Reimbursement was negotiated at arms' length and in good faith and is necessary to secure the Buyer's participation in the Debtors' sale process. Without the

13

Buyer's participation as a stalking horse bidder, the Debtors would be unable to secure the Proposed DIP Financing. The Debtors have determined that pursuing the Transaction is in the best interests of the Debtors, their creditors and their estates, and therefore submit that agreeing to the minimal Expense Reimbursement represents an appropriate exercise of the Debtors' business judgment.

32.     Bankruptcy courts have approved bidding incentives, including traditional expense reimbursement provisions, under the business judgment rule, which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. See, e.g., In re Integrated Res., 147 B.R. at 662 (approving termination fee plus reimbursement of expenses); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking"). The Debtors submit that the Expense Reimbursement is reasonable, is legitimately necessary to convince the Buyer to go forward with the Transaction, and that agreeing to the Expense Reimbursement represent a valid exercise of the Debtors' business judgment.

### v.     The Proposed Notice Procedures for the Assigned Contracts and the Identification of Related Cure Amounts Are Appropriate

33.     As part of the Motion, the Debtors also seek authority under sections 105(a) and 365 to assume and assign the Assigned Contracts to the Successful Bidder. The Bid Procedures specify the process by which the Debtors will serve Cure and Possible Assumption and Assignment Notices and the procedures and deadline for counterparties to Assigned Contracts to file and serve Cure or Assignment Objections.

14

34. Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assigned Contract, at the closing of the Transaction, the Successful Bidder shall cure those defaults under the Assigned Contracts that need to be cured in accordance with section 365(b) of the Bankruptcy Code, by (a) payment of the undisputed cure amount (the "Cure Amount") and/or (b) reserving amounts with respect to any disputed cure amounts.

## B. Approval of the Proposed Sale Transaction Is Appropriate and in the Best Interests of the Estates

### i. The Sale of the Acquired Assets is Authorized by Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtors' Business Judgment

35. Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. See Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 174 (D. Del. 1991).

36. Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. See In re Delaware & Hudson Ry. Co., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

37. A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets

15

for the estate, its creditors or interest holders. See, e.g., In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983).

38.     Furthermore, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re Integrated Res., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code. Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions. See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.), 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

39.     The value of the Acquired Assets will be tested through the Auction conducted pursuant to and according to the Bid Procedures. Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means for establishing whether a fair and reasonable price is being paid.

40.     Thus, the Debtors submit that the Stalking Horse Agreement or, as the case may be, a sale agreement with the Successful Bidder, will constitute the highest and best offer for the

16

Acquired Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. As such, the Debtors' determination to sell the Acquired Assets through an Auction process and subsequently to enter into the Stalking Horse Agreement with the Buyer or, alternatively enter into a sale agreement with the Successful Bidder, will be a valid and sound exercise of the Debtors' business judgment. The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request that the Court make a finding that the proposed sale of the Acquired Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

41.     Pursuant to Local Rule 6004-1(b)(iv)(A), if a proposed sale is to an insider, as defined in Bankruptcy Code section 101(31), the sale motion must (a) identify the insider, (b) describe the insider's relationship to the Debtor, and (c) set forth any measures taken to ensure the fairness of the sale process and the proposed transaction. As noted above, the Buyer is an affiliate of Hancock (who owns all of the equity of the Debtors and is a significant unsecured creditor of the Debtors), and thus could be construed as an insider of the Debtors. Once the Buyer provided an offer to purchase the assets of the Debtors, the Debtors began arms' length negotiations with the Buyer and its counsel concerning the terms of the Stalking Horse Agreement and the Bidding Procedures, all of which were subject to the approval of the Postpetition Lender. The Debtors believe that the ultimate test to show the fairness of the proposed Transaction will be a market test of its terms at auction.

42.     Pursuant to Local Rule 6004(1)(b)(iv)(F), a sale motion must highlight whether the Buyer has submitted a good faith deposit and the conditions under which such deposit may be forfeited. Pursuant to the Stalking Horse Agreement, the Buyer provided the Debtors with a $150,000 good faith deposit. *See* Stalking Horse Agreement, Section 1.2(c). This deposit is

17

non-refundable in all events, excepting only if the transaction with Buyer does not close due to (i) the Debtors' accepting the bid of a rival bidder at a time when Buyer is not in breach of the Stalking Horse Agreement, (ii) the Buyer materially breaching its obligations under the terms of the Stalking Horse Agreement, or (iii) the Buyer terminating this Agreement pursuant to Section 7.1(a) of the Stalking Horse Agreement.

43.     Pursuant to Local Rule 6004(1)(b)(iv)(H), a sale motion must highlight any provision pursuant to which a debtor proposes to release sale proceeds on or after closing without further Court. The Debtors' prepetition lenders and Post-Petition Lenders have required that the order approving the sale of the Acquired Assets provide that on the Closing Date, the Debtors shall pay in full all Obligations (as defined in the Interim Financing Order Authorizing Borrowing with Priority Over Administrative Expense and Secured by Liens on Property of the Estate Pursuant to Section 364(c) of the Bankruptcy Code) owed to the Debtors' prepetition lenders and Post-Petition Lenders.

44.     Pursuant to Local Rule 6004(1)(b)(iv)(L), a sale motion should highlight any provision limiting the proposed purchaser's successor liability. Section 1.3 of the Stalking Horse Agreement provides that the Buyer shall not have any successor liability related to Debtors or the Acquired Assets to the maximum extent permitted by law.

45.     Pursuant to Local Rule 6004(1)(b)(iv)(L), a sale motion must highlight any provision by which the debtor seeks to allow credit bidding pursuant to Bankruptcy Code section 363(k). The Bidding Procedures allow the Buyer to credit bid the full amount of the Expense Reimbursement pursuant to any Overbid in connection with each round of bidding at the Auction. *See* Bidding Procedures, ¶ 4(a).

### ii. The Sale of the Acquired Assets Free and Clear of Claims and Interests Is Authorized by Section 363(1) of the Bankruptcy Code

46.     The Debtors further submit that it is appropriate to sell the Acquired Assets free and clear of all claims and interests (collectively, the "Claims and Interests") pursuant to section 363(f) of the Bankruptcy Code, with any such Claims and Interests attaching to the net sale proceeds of the Acquired Assets, as and to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

(a)     applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

47.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

48.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Acquired Assets "free and clear" of all Claims and Interests. In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); Citcorp Homeowners Servs., Inc. v. Eliot (In re Eliot), 94 B.R. 343, 345 (E.D.

19

Pa. 1988) (same); Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of section 363(f) of the Bankruptcy Code is met).

49.     The Debtors believe that one or more of the tests of section 363(f) of the Bankruptcy Code will be satisfied with respect to the transfer of the Acquired Assets pursuant to the Stalking Horse Agreement or, as the case may be, an agreement with the Successful Bidder. In particular, the Debtors believe that at least section 363(f)(2) of the Bankruptcy Code will be met in connection with the Transaction because each of the parties holding liens on the Acquired Assets, if any, will consent, or absent any objection to this Motion, will be deemed to have consented to, the sale and transfer of the Acquired Assets.

50.     Any lienholder also will be adequately protected by having its liens, if any, attach to the sale proceeds received by the Debtors for the sale of the Acquired Assets to the Buyer or, as the case may be, to the Successful Bidder, in the same order of priority, with the same validity, force and effect that such creditor had prior to such sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto. Accordingly, section 363(f) of the Bankruptcy Code authorizes the sale and transfer of the Acquired Assets free and clear any such Claims and Interests.

### iii.     The Acquired Assets and Assigned Contracts Should Be Sold Free and Clear of Successor Liability

51.     The Stalking Horse Agreement provides that Buyer shall not have any successor liability related to Seller or the Acquired Assets to the maximum extent permitted by law. See Stalking Horse Agreement, ¶ 1.3. Extensive case law exists providing that claims against a

20

winning bidder are directed to the proceeds of a free and clear sale of property and may not subsequently be asserted against a buyer.

52.     Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d Cir. 2000). In the case of In re Trans World Airlines. Inc., 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest." The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in property," the trend in modem cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" Id. at 289 (citing 3 Collier on Bankruptcy 363.06[1]). As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-82 (4th Cir. 1996), a case cited approvingly and extensively by the Third Circuit in Folger, the scope of section 363(f) is not limited to *in rem* interests. Thus, the Third Circuit in Folger stated that Leckie held that the debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." Folger, 209 F.3d at 258.

53.     Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims. See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.. 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section

21

363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); In re Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); American Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); WBQ P'ship v. Virginia Dept. of Medical Assistance Services (In re WBQ P'ship), 189 B.R. 97, 104-05 (Bankr E D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).[4]

54.    The purpose of an order purporting to authorize the transfer of the Acquired Assets would be frustrated if claimants thereafter could use the transfer as a basis to assert claims against the Buyer or, as the case may be, the Successful Bidder. Under section 363(f) of the Bankruptcy Code, the Buyer or, as the case may be, the Successful Bidder is entitled to know that the Acquired Assets are not infected with latent claims that will be asserted against the Buyer or the Successful Bidder after the proposed transaction is completed.

55.    Accordingly, consistent with the above-cited case law, the order approving the sale of the Acquired Assets should state that the Buyer or, as the case may be, the Successful Bidder is not liable as a successor under any theory of successor liability, for Claims or Interests that encumber or relate to the Acquired Assets.

---

[4] Even courts concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims have nevertheless found that section 105(a) of the Bankruptcy Code provides such authority. See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of liens poses no impediment to such a sale, as such authority is implicit in the court's equitable power when necessary to carry out the provisions of title 11).

CHI1 1677147v.2

iv.    **The Buyer or the Successful Bidder is a Good Faith Purchaser and is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code, and the Transfer and Sale of the Acquired Assets Does Not Violate Section 363(n) of the Bankruptcy Code**

56.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Third Circuit

in In re Abbotts Dairies of Pennsylvania, Inc. held that:

> [t]he requirement that a [buyer] act in . . . good faith speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [Proposed Buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citation omitted).

57.    As such, a party would have to show fraud or collusion between the Buyer or, as

the case may be, the Successful Bidder and the Debtors or other Bidders to demonstrate a lack of

good faith. See Kabro Assocs. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill

Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a

[buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and

other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders"); see

also In re Angelika Films. 57th, Inc., 1997 WL 283412, at *7 (S.D.N.Y. 1997); In re Bakalis.

220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

58.    The Buyer and the Debtors have engaged in thorough arms' length negotiations

over the terms of the Stalking Horse Agreement. Similarly, in the event someone other than the

23

Buyer is the Successful Bidder, by the time of execution of an agreement is executed by the Debtors and the Successful Bidder, the Debtors and the Successful Bidder will have engaged in thorough arms' length negotiations over the terms of such agreement. In addition, both the Buyer and any Successful Bidder will have complied with the terms and conditions of the Bid Procedures Order.

59. Moreover, in this case, there will be absolutely no fraud or improper insider dealing of any kind. The Debtors will ensure that the Stalking Horse Agreement or, as the case may be, an agreement with the Successful Bidder, does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code, and, as a result, the Buyer or any Successful Bidder should receive the protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code. Accordingly, the Debtors request that the Court make a finding at the Sale Hearing that the Stalking Horse Agreement or, as the case may be, an agreement with the Successful Bidder, reached with the Successful Bidder was at arms' length and is entitled to the full protections of section 363(m) of the Bankruptcy Code. The Debtors will submit evidence at the Sale Hearing to support these conclusions.

### v. Assumption and Assignment of the Assigned Contracts Is Authorized by Section 365 of the Bankruptcy Code

60. Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor in possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

24

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee —

> (A)    cures or provides adequate assurance that the trustee will promptly cure, such default . . .;

> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

> (C)    provide adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

61.    The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superceded in part by 11 U.S.C. § 1113).

62.    Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. See In re Decora Indus., Inc., 2002 WL 32332749, at *8 (D. Del. 2002); Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp., 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); see also Phar Mor, Inc. v. Strouss Bldg.

25

<u>Assocs.</u>, 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).[5]

63.    In the present case, the Debtors' assumption and assignment of the Assigned Contracts to the Successful Bidder will meet the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. As discussed above, the transactions contemplated by the Stalking Horse Agreement will provide significant benefits to the Debtors' estates. Because the Debtors May not be able to obtain the benefits of the Stalking Horse Agreement or, as the case may be, an agreement with the Successful Bidder, without the assumption of the Assigned Contracts, the assumption of these Assigned Contracts is undoubtedly a sound exercise of the Debtors' business judgment.

64.    Further, a debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code, and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. See 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. <u>See, e.g.</u>, <u>In re Bygaph, Inc.</u>, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

---

[5] Further, "[n]othing in the Code suggests that the debtor may not modify its contracts when all parties to the contracts consent." <u>In re Network Access Solutions, Corp.</u>, 330 B.R. at 74 (citations omitted). While "[s]ection 363 of the Bankruptcy Code allows a debtor to . . . modify contracts . [t]o the extent they are outside the ordinary course of business, court approval is necessary." <u>Id</u>. Regardless, "[t]here is ... no discernable difference in the notice requirements or standard for approval under section 363 or 365." <u>Id</u>.

26

65.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng' g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

66.     Counterparties to Assigned Contracts will have the opportunity to object to adequate assurance of future performance by any of the Bidders. Accordingly, the Debtors submit that the assumption and assignment of the Assigned Contracts as set forth herein should be approved.

67.     To assist in the assumption, assignment and sale of the Assigned Contracts, the Debtors also request that the order approving the sale of the Acquired Assets provide that anti-assignment provisions in the Assigned Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

68.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . . .

11 U.S.C. § 365(f)(1).

69.     Section 365(f)(1) of the Bankruptcy Code, by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired

lease. See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.), 127 F.

3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from

permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when

to do so will effectuate the purposes of section 365") cert. denied, 522 U.S. 1148 (1998). Section

365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the Bankruptcy

Code by prohibiting enforcement of any clause creating a right to modify or terminate the

contract or lease upon a proposed assumption or assignment thereof. See, e.g., In re Jamesway

Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) of the Bankruptcy Code prohibits

enforcement of any lease clause creating right to terminate lease because it is being assumed or

assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those

entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

70.     Other courts have recognized that provisions that have the effect of restricting

assignments cannot be enforced. See In re Rickel Home Ctrs., Inc., 240 B.R. 826, 831 (D. Del.

1998) ("In interpreting Section 365(f) [sic], courts and commentators alike have construed the

terms to not only render unenforceable lease provisions which prohibit assignment outright, but

also lease provisions that are so restrictive that they constitute de facto anti-assignment

provisions."). Similarly, in In re Mr. Grocer, Inc., the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code
> establishes that the court does retain some discretion in
> determining that lease provisions, which are not themselves ipso
> facto anti-assignment clauses, may still be refused enforcement in
> a bankruptcy context in which there is no substantial economic
> detriment to the landlord shown, and in which enforcement would
> preclude the bankruptcy estate from realizing the intrinsic value of
> its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987). Thus, the Debtors request that any anti-assignment

provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the

28

Assigned Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

### vi. Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate

71. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign and executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request that any order approving the Stalking Horse Agreement or, as the case may be, a sale agreement with the Successful Bidder, and assumption and assignment of the Assigned Contracts be effective immediately by providing that the ten-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

72. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten-day stay period, the leading treatise on bankruptcy suggests that the ten-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 Collier on Bankruptcy ¶ 6004.10 (15th rev. ed. 2006). Furthermore, Collier suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

73. To maximize the value received for the Acquired Assets, the Debtors seek to close the Transaction as soon as possible after the Sale Hearing. Accordingly, the Debtors

29

respectfully request that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## VI.
## No Prior Request

74.     No prior motion for the relief requested herein has been made to this or any other court.

## VII.
## Notice

75.     The Debtors have provided this Motion and notice of this Motion to: (i) the Office of the United States Trustee, (ii) the Internal Revenue Service; (iii) the Office of the United States Attorney for the District of Delaware; (iv) the Debtors' thirty largest unsecured creditors on a consolidated basis; (v) counsel to the Debtors' prepetition and postpetition lender; and (vi) counsel to the Buyer (collectively, the "Notice Parties"). The Debtors will provide notice of this Motion and the hearing on this Motion to all entities who are known to possess or assert a claim against the Debtors. Notice of this Motion and any order entered hereon will be served in accordance with Local Rule 9013-1(m). In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## VIII.
## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter (a) an order, the form of which is attached as **Exhibit D**, approving the Bid Procedures and the Bid Protections; (b) an order, the form of which is attached as **Exhibit E**, (i) approving the Stalking Horse Agreement between the Debtors and the Buyer or, as the case may be, approving an agreement between the Debtors and the Successful Bidder, to acquire the Acquired Assets, (ii) authorizing the sale of the Acquired Assets free and clear of all Claims and Interests and (iii) authorizing the

30

assumption and assignment of the Assigned Contracts to the Successful Bidder; and (c) granting

such other and further relief as is just and proper.

Dated:  Wilmington, Delaware
        May 19, 2010

Respectfully submitted,

LOCKE LORD BISSELL & LIDDELL LLP
David W. Wirt (Pro Hac Vice Motion Pending)
Aaron C. Smith (Pro Hac Vice Motion Pending)
Courtney E. Barr (Pro Hac Vice Motion Pending)
111 S. Wacker Drive
Chicago, Illinois 60606-4410
Telephone: (312) 443-0700
Fax: (312) 443-0336

-and-

POLSINELLI SHUGHART PC

   /s/  Christopher A. Ward
Christopher A. Ward (Del. Bar No. 3877)
Justin K. Edelson (Del. Bar No. 5002)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Fax: (302) 252-0921

PROPOSED COUNSEL FOR THE DEBTORS

CHI1 1677147v.2