EXHIBIT A

## ASSET PURCHASE AND LIQUIDATION SALE AGREEMENT

This Asset Purchase and Liquidation Sale Agreement (this "Agreement") is entered into as of August 17, 2010, by and between a joint venture comprised of HPC3 Furniture Holdings, LLC, a Delaware limited liability company ("HPC3"), Liquid Asset Partners, LLC, a Michigan limited liability company ("LAP") and Joerns Healthcare Operating, LLC, a Delaware limited liability company ("JHO" and together with LAP and HPC3, collectively, the "Buyer"), on the one hand, and Barcalounger Corporation, a Delaware corporation ("Barcalounger"), and American of Martinsville, Inc., a Delaware corporation ("AOM"; collectively with Barcalounger, "Sellers" and each, a "Seller"), on the other hand.

### Recitals

WHEREAS, on May 19, 2010 (the "Petition Date"), the Sellers each filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), commencing the chapter 11 cases captioned In re Barcalounger Corporation, et al., Case No. 10-11637 (BLS) (Jointly Administered); and

WHEREAS, Sellers desire to sell and Buyer desires to buy substantially all of the business related assets of Sellers as hereinafter described; and

WHEREAS, LAP desires to conduct a Liquidation Sale (defined below) of certain of the Liquidation Assets (defined below) at the Seller Locations (defined below) during the Sale Term (defined below).

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by all parties, the parties have agreed as follows:

### Agreement

### ARTICLE I

### PURCHASE AND SALE OF ASSETS

1.1    Definitions. For purposes of this Agreement, the following terms shall have the following respective meanings:

"Agreement" has the meaning set forth in the opening paragraph of this document.

"Assets" shall mean, collectively, all of the assets of the Sellers, including, without limitation, claims arising under federal "Anti-Dumping" laws, inventory, work in process, raw materials, supplies, fixtures, furniture equipment, computers, machinery, vehicles, trailers, trade secrets, good will and other Intellectual Property and other assets used in the Business, including,

1

without limitation, the Liquidation Assets and those items described on Exhibit 1.1(a) attached hereto and incorporated herein, but shall not include the Excluded Assets.

"Auction" means an auction for the Assets of the Sellers to be conducted in accordance with the Solicitation, Bid and Auction Procedures (defined below).

"Bankruptcy Case" has the meaning set forth in the recitals of this Agreement.

"Bankruptcy Code" has the meaning set forth in the recitals of this Agreement.

"Bankruptcy Court" has the meaning set forth in the recitals of this Agreement.

"Bid Procedures Order" shall mean the Order (a) Approving Bid Procedures and Expense Reimbursement, and (b) Approving the Form and Manner of Notices Thereof entered by the Bankruptcy Court on July 7, 2010.

"Business" shall mean the business of furniture manufacture as currently engaged in by the Sellers.

"Business Day" shall mean a date on which major banks are open for business in the City of Los Angeles, California.

"Buyer" has the meaning set forth in the opening paragraph of this Agreement.

"Closing" shall mean the closing of the transactions between Buyer and Sellers contemplated herein.

"Closing Date" shall mean the date on which the Closing occurs.

"Committee" shall mean the official committee of unsecured creditors appointed in the Bankruptcy Case.

"Escrow Agreement" shall mean that certain Escrow Agreement between Buyer, Sellers, and "Escrow Agent" (as designated in the Escrow Agreement) dated as of May 19, 2010.

"Excluded Assets" shall mean (i) all executory contracts or unexpired leases or leased equipment; (ii) Receivables; (iii) cash or cash equivalents; (iv) pre-petition and postpetition claims and causes of action other than the claims arising under federal "Anti-Dumping" laws as described within the definition of Assets; and (v) books and records of the Debtors (including all information electronically stored) but excluding documents relating to the Assets. .

"Expenses" shall mean all occupancy costs, insurance and utilities with respect to each of the Seller Locations, and removal of all electronic data from the Debtors' computers, provided, that, in the event the Sale Termination Date is subsequent to October 31, 2010, LAP shall pay all occupancy costs and utilities for the Seller Locations in the actual amount not to exceed $35,000 in the aggregate and Sellers shall be responsible for any amounts in excess of $35,000.

2

"Intellectual Property" shall mean all intellectual property owned by each of the Sellers, including, without limitation, patents, copyrights, samples, customer and CAD files, trade names, trade secrets and trademarks, and electronic files and printed documents, which relate to which are useful in operating the Business, including, without limitation, those set forth on Exhibit 1.1(a) hereto.

"Liquidation Assets" means all of the Assets not described on Exhibit 1.1(a) attached hereto.

"Liquidation Sale" shall mean a going out of business sale, negotiated sale, auction or other similar type of sale of the Liquidation Assets at the Seller Locations.

"Receivables" shall mean accounts receivable from customers of either Seller or otherwise arising in the ordinary course of the Business.

"Sale Commencement Date" shall mean the Closing Date.

"Sale Order" shall mean an order of the Bankruptcy Court approving the transactions contemplated in this Agreement.

"Sale Termination Date" means up to the ninetieth (90th) day from the Sale Commencement Date, provided, that LAP may terminate the Liquidation Sale at any or all of the Seller Locations by providing the Sellers with three (3) days advance notice; provided, however, that in no event shall the Sale Termination Date occur after November 30, 2010.

"Seller" and "Sellers" have the meanings set forth in the opening paragraph of this Agreement.

"Seller Locations" shall mean the locations where the Assets are located including, without limitation, the locations set forth on Exhibit 1.1(b) attached hereto and incorporated herein.

"Solicitation, Bid and Auction Procedures" means those certain procedure as established by the Bankruptcy Court for the establishment and conduct of the Auction.

"Unsecured Lenders" means Hancock Park Capital III, L.P. and Hancock Management Partners.

"Unsecured Lender Claims" means all filed and scheduled claims of the Unsecured Lenders including, without limitation, the proofs of claim in the amount of $33,241,544 filed by the Unsecured Lenders for amounts borrowed by Sellers from the Unsecured Lender.

    1.2    <u>Purchase; Purchase Price; Earnest Money; and Abandoning Assets.</u>

        (a)    <u>Purchase and Conduction of Liquidation Sale; Abandoning Assets;</u>

3

Expenses. Subject to final approval of this transaction by the Bankruptcy Court and upon the terms and subject to the conditions contained in this Agreement, (i) Sellers shall sell, assign, and deliver to Buyer, free and clear of all claims, interests, liens and encumbrances and Buyer shall purchase and accept, all respective right, title and interest of the Sellers in and to the Assets, and (ii) LAP shall conduct the Liquidation Sale of the Liquidation Assets at the Seller Locations during the Sale Term, free and clear of all claims, interests, liens and encumbrances.

(b)     Purchase Price. Upon the terms and subject to the conditions set forth in this Agreement, Buyer shall pay to Sellers the aggregate amount (the "Purchase Price") of One Million Nine Hundred Ten Thousand Five Hundred and Eighty Four Dollars ($1,910,584), with a credit for the Earnest Money Deposit as defined below, in cash by wire transfer in immediately available funds, to be apportioned in the Sellers' sole discretion. The Debtors agree that $125,000 of the Purchase Price shall be held by the Debtors in a separate segregated account to timely pay Expenses through the earlier of the Sale Termination Date or October 31, 2010 provided that any unused portion of this amount shall be transferred from such segregated account to the Debtors' general account. Prior to the Closing, the Buyers shall have reasonable access to the Seller Locations for purposes of inspection of the Assets. If there is a material discrepancy in the Assets from that of June 25, 2010, the Debtors and the Buyers, in consultation with the Committee, will agree upon an adjustment to the Purchase Price.

(c)     Earnest Money. Buyer has delivered to the Escrow Agent, a deposit in the amount of $327,000 (the "Earnest Money Deposit"). The Escrow Agent shall hold the Earnest Money Deposit in an interest-bearing escrow account pursuant to the terms of the Escrow Agreement with the Buyer. Such deposit shall be non-refundable in all events, excepting only if the transaction with Buyer does not close due to (i) Sellers accepting the bid of a rival bidder at a time when Buyer is not in breach of this Agreement, (ii) Sellers materially breaching their obligations hereunder; or (iii) Buyer terminating this Agreement pursuant to Section 7.1(a) hereof.

(d)     Abandoning Assets. Notwithstanding anything to the contrary contained in this Agreement, Buyer shall have the right to abandon in place any unsold Assets on the Sale Termination Date with no liability to Buyer.

(e)     Use of Sellers' Names. During the Sale Term, LAP shall have the right to use the name "Barcalounger" or "American of Martinsville" in advertising and conducting the Liquidation Sale of the Liquidation Assets during the Sale Term at no cost to LAP.

1.3     No Assumption of Any Liabilities. It is understood and agreed that Buyer shall not assume or become liable directly, indirectly, contingently or otherwise for the payment of any debts, liabilities, losses, accounts payable, bank indebtedness, mortgages, or other obligations of Sellers of any nature whatsoever, whether related to the Assets or otherwise and such other liabilities, whether the same are known or unknown, now existing or hereafter arising, of whatever nature or character, whether absolute or contingent, liquidated or disputed. Buyer shall not have any successor liability related to Sellers or the Assets to the maximum extent permitted by law.

{00086599.DOC; 2}

1.4    Closing. Subject to the satisfaction or waiver of the conditions set forth herein, the consummation of the transactions contemplated by this Agreement which has been approved by the Bankruptcy Court shall take place within five Business Days following the satisfaction or waiver of all other conditions to Closing set forth in Article VI, at the offices of counsel to the Sellers (or on such other date at such other time and place as the parties shall agree in writing).

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller hereby represents and warrants to Buyer as follows with respect to such Seller:

2.1    Organization, Standing and Power. Each Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has the requisite corporate power and authority to effect the transactions contemplated hereunder.

2.2    Authority. Except for approval of the Bankruptcy Court, each Seller has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement by each Seller and the consummation by each Seller of the transactions contemplated hereby have been duly and validly authorized by all necessary action on the part of each Seller. This Agreement has been duly and validly executed and delivered by each Seller and (assuming the valid authorization, execution and delivery of this Agreement by Buyer) constitutes the legal, valid and binding obligation of each Seller and is enforceable against each Seller in accordance with its terms.

2.3    Brokers. No broker, investment banker or other person engaged by Sellers is entitled to any broker's, finder's, or other similar fee or commission in connection with the transactions contemplated by this Agreement.

2.4    No Conflict. The consummation of the transactions contemplated by this Agreement and compliance with the provisions hereof will not (i) conflict with or result in a breach of the terms, conditions or provisions of any order of any court or other agency of government, or the charter or bylaws of Sellers, or (ii) result in the creation or imposition of any lien, charge or encumbrance of any kind whatsoever on any of Sellers' Assets.

2.5    Title. Each Seller holds title to all of its Assets and has not received any claims of infringement against such Seller related to the Intellectual Property.

2.6    Liquidation Sale. LAP shall have the right to conduct the Liquidation Sale of the Liquidation Assets pursuant to the terms of this Agreement at the Seller Locations during the Sale Term.

2.7    Seller Locations. LAP shall have the peaceful and quiet possession of the Seller Locations during the Sale Term to advertise and conduct the Liquidation Sale of the Liquidation Assets in accordance with the terms of this Agreement.

5

2.8    <u>Expenses.</u> Seller shall timely pay all Expenses.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF BUYER

Each of HPC3, LAP and JHO (each an "Individual Buyer") represents and warrants, severally, and not jointly, to Sellers as follows:

3.1    <u>Organization, Standing and Power.</u> Individual Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of its State of formation and has the requisite power and authority to carry on its business as now being conducted and to effect the transactions contemplated hereunder.

3.2    <u>Authority.</u> Individual Buyer has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement by Individual Buyer and the consummation by Individual Buyer of the transactions contemplated hereby have been duly and validly authorized by all necessary action on Individual Buyer's part. This Agreement has been duly and validly executed and delivered and (assuming the valid authorization, execution and delivery of this Agreement by Sellers) constitutes the legal, valid and binding obligation of Individual Buyer and is enforceable against Individual Buyer in accordance with its terms.

3.3    <u>Consents and Approvals; No Violation.</u> The execution and delivery of this Agreement by Individual Buyer does not, and the consummation of the transactions contemplated hereby and compliance with the provisions hereof will not, result in any violation of, or default (with or without notice or lapse of time, or both) under, or give to others a right of termination, cancellation or acceleration of any obligation or the loss of a material benefit under, or result in the creation of any lien, security interest, charge or encumbrance upon any of the properties or assets of Individual Buyer or any of its subsidiaries under, any provision of (i) the charter or organizational document or bylaws of Individual Buyer, (ii) any provision of the comparable charter or organizational documents of any of Individual Buyer's subsidiaries, (iii) any loan or credit agreement, note, bond, mortgage, indenture, lease or other agreement, instrument, permit, concession, franchise or license applicable to Individual Buyer or any of its subsidiaries or (iv) any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Individual Buyer or any of its subsidiaries or any of their respective properties or assets, other than, in the case of clauses (ii), (iii) or (iv), any such violations, defaults, rights, liens, security interests, charges or encumbrances that, individually or in the aggregate, would not prevent the consummation of any of the transactions contemplated hereby in accordance with the terms of this Agreement. No filing or registration with, or authorization, consent or approval of, any governmental entity is required by or with respect to Individual Buyer or any of its subsidiaries in connection with the execution and delivery of this Agreement by Individual Buyer or is necessary for the consummation of the transactions contemplated by this Agreement.

3.4    <u>Brokers.</u> No broker, investment banker, or other person engaged by Individual Buyer is entitled to any broker's, finder's, or other similar fee or commission payable by the

{00086599.DOC; 2}

Sellers in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Individual Buyer.

3.5    No Conflict. The consummation of the transactions contemplated by this Agreement and compliance with the provisions hereof will not conflict with or result in a breach of the terms, conditions or provisions of any order of any court or other agency of government to which Individual Buyer is subject, or the charter or bylaws of Individual Buyer.

## ARTICLE IV

## COVENANTS OF SELLERS

4.1    Pre-Closing Covenants of Sellers. Each Seller covenants for itself to Buyer that pending completion of the transactions contemplated by this Agreement, as of June 25, 2010, and as of the Closing Date through the Sale Termination Date:

(a)    Each of its representations and warranties set forth in Article II hereof shall be true and correct in all material respects.

(b)    Such Seller will maintain itself at all times up to and including the Closing Date as a duly licensed corporation in good standing under the laws of its state of incorporation.

(c)    Such Seller will not sell, dispose of, mortgage, pledge or allow any lien to be placed upon any of the Assets, except those in existence on the date hereof and those authorized upon order of the Bankruptcy Court with due advance notice to Buyer. Any sale to Buyer shall be free and clear of any and all such liens. The sale of the Assets to Buyer and the Liquidation Sale of the Liquidation Assets to be conducted by LAP shall be free and clear of any and all such liens, claims, encumbrances and interests.

(d)    Such Seller will operate the Business in a manner reasonably consistent with the immediate pre-petition practices in place and from June 25, 2010, has not and will not sell any Assets to be conveyed hereunder.

(e)    Seller shall pay all Expenses when due.

## ARTICLE V

## COVENANTS OF BUYER AND SELLERS

5.1    Approvals of Third Parties; Reasonable Best Efforts.

(a)    Upon the terms and subject to the conditions set forth in this Agreement, Sellers and Buyers agree to use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, including, without limitation: (i) the obtaining of all necessary actions or non-actions, waivers,

7

consents, approvals, authorizations and exemptions from all governmental entities and the making of all necessary registrations and filings (including filings with governmental entities) and the taking of all reasonable steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding by, any governmental entity; (ii) the obtaining of all necessary consents, approvals or waivers from third parties; (iii) the defending of any lawsuits or other legal proceedings, whether judicial or administrative, challenging this Agreement or the consummation of the transactions contemplated hereby, including seeking to have any stay or temporary restraining order entered by any court or other governmental entity vacated or reversed; and (iv) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated by this Agreement. No party to this Agreement shall consent to any voluntary delay of the consummation of the transactions contemplated by this Agreement at the behest of any governmental entity without the consent of the other parties to this Agreement, which consent shall not be unreasonably withheld.

(b)     Each Seller will use its reasonable best efforts to cause or obtain the satisfaction of the conditions applicable to such Seller specified in Sections 6.1 and 6.3 below. Buyer will use its reasonable best efforts to cause or obtain the satisfaction of the conditions applicable to Buyer specified in Sections 6.1 and 6.2 below.

5.2     <u>Fees and Expenses</u>.   All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby including, without limitation, the fees and disbursements of counsel, financial advisors and accountants, shall be paid by the party incurring such costs and expenses.

5.3     <u>Waiver of Claims</u>.   Immediately following the Closing, HPC3 shall cause Unsecured Lenders, and Unsecured Lenders shall be deemed pursuant to the Sale Order, to have waived and relinquished all of its Unsecured Lender Claims against Sellers. Unsecured Lender shall not sell or otherwise transfer ownership or control of the Unsecured Lender Claims.

5.4     <u>Sellers Books and Records</u>.   Within thirty (30) days of the Closing Date, Sellers shall remove all of its books and records from the Liquidation Assets and also remove, to the extent reasonably practicable, all electronic data from the computers that are part of the Liquidation Assets; provided, however, that notwithstanding anything to the contrary, the Debtors shall make the computers available to the Buyers no later than thirty (30) days after the Closing Date with all electronic data removed from the computers.

## ARTICLE VI

## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

6.1     <u>Conditions to Each Party's Obligations</u>.   The respective obligations of each party to effect the transactions contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the following conditions:

(a)     <u>No Order Preventing Transactions</u>.   No court or other governmental entity having jurisdiction over Sellers or Buyer, or any of their respective subsidiaries, shall have

8

enacted, issued, promulgated, enforced or entered any law, rule, regulation, executive order, decree, injunction or other order (whether temporary, preliminary or permanent) which is then in effect and has the effect of making the transactions contemplated by this Agreement illegal.

(b)     <u>Bankruptcy Court Approval</u>.  The Bankruptcy Court shall have entered the Sale Order, which Sale Order shall not have been reversed or subject to any stay.  The Sale Order shall be in form and substance acceptable to Buyer in its reasonable discretion.

6.2     <u>Conditions to Obligation of Sellers</u>.  The obligation of Sellers to effect the transactions contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the condition that Buyer shall have performed in all material respects each of its covenants and agreements contained in this Agreement required to be performed on or prior to the Closing Date, including payment of the Purchase Price, and each of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date as if made on and as of such date.

6.3     <u>Conditions to Obligations of Buyer</u>.  The obligations of Buyer to effect the transactions contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the following additional conditions:

(a)     <u>Performance of Obligations; Representations and Warranties</u>.  Each Seller shall have performed in all material respects each of its covenants and agreements contained in this Agreement required to be performed on or prior to the Closing Date, and each of the representations and warranties of Sellers contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date as if made on and as of such date.

(b)     <u>Transfer and Assumption Documents</u>.  On the Closing Date, Sellers shall convey title to the Assets to Buyer by executing documents in form and substance reasonably acceptable to Buyer.

(c)     <u>Other Closing Documents</u>.  Sellers shall deliver lien releases from the liens on the Assets and such other documents as Buyer may reasonably request at Closing; provided, however, that the failure of the Sellers to provide or obtain a lien release shall not alter the effect of the Sale Order and, notwithstanding any failure to deliver lien releases, upon the entry of the Sale Order, the sale of Assets shall be deemed free and clear of all claims against and interests in the Assets.

(d)     LAP shall be allowed to conduct the Liquidation Sale of the Liquidation Assets at the Seller Locations during the Sale Term in accordance with the terms of this Agreement.

**ARTICLE VII**

**TERMINATION, AMENDMENT, AND WAIVER**

{00086599.DOC; 2}

7.1 <u>Termination</u>. This Agreement may be terminated in writing at any time prior to the Closing Date:

(a) By Buyer, (i) if the Closing does not occur within five (5) days after the date of entry of a final and nonappealable Sale Order and such failure is not due to a breach by Buyer or Buyer's unreasonable delay of Closing or (ii) no Sale Order has been entered by August 20, 2010; other than due to Buyer's breach of this Agreement;

(b) By Sellers, (i) if the Closing does not occur within five (5) days after the date of entry of a final and nonappealable Sale Order and such failure is not due to a breach by either Seller or (ii) no Sale Order has been entered by August 20, 2010; other than due to either Seller's breach of this Agreement; or

(c) By Buyer or Sellers if, before the Closing Date, the other party is in material breach of any representations, warranty, covenant or agreement contained herein and has not cured the same.

7.2 <u>Liability if Agreement Terminated</u>. Termination of this Agreement shall not relieve any party of any liability for breaches of this Agreement prior to the date of termination.

## ARTICLE VIII

## GENERAL PROVISIONS

8.1 <u>Survival of Representations and Warranties</u>. The representations and warranties set forth in this Agreement or in any schedule, exhibit or instrument delivered pursuant to this Agreement by Sellers shall terminate upon Closing.

8.2 <u>Expenses</u>. Each party shall pay its own expenses incident to this Agreement and the transactions hereby contemplated. In the event of any litigation between the parties arising out of this Agreement, the prevailing party shall be entitled to recover from the other party its court costs and reasonable attorneys' fees at the trial and all appellate levels.

8.3 <u>Notices</u>. Any notice, communication, request, reply or advice hereunder (a "Notice") must be in writing and shall be delivered by email with a copy by reputable overnight commercial courier service or hand delivery. Notice so given shall be effective when delivered on a Business Day before 5 p.m. Refusal of delivery shall be deemed to be receipt. Notice given in any other manner shall be effective when received by the party to whom it is given. For purposes of Notice, the addresses of the parties shall be as follows:

If to Sellers: Mr. John Chapman
Chief Restructuring Officer
c/o Corporate Forensics, LLC
209 NE 5th Terrace
Delray Beach, FL 33444
Phone: 561-278-7008

{00086599.DOC; 2}

Fax: 561-278-7078

with copies to David W. Wirt, Esq.
Aaron C. Smith, Esq.
Locke Lord Bissell & Liddell LLP
111 South Wacker Drive
Chicago, IL 60606
Tel: (312) 443-0700
Fax: (312) 443-0336

Bruce Buechler, Esq.
Timothy R. Wheeler, Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ 07068
Tel: (973) 597-2500
Fax: (973) 597-2400

If to Buyer: Mr. Michael Gooch
HPC 3 Furniture Holdings, LLC
1880 Century Park East, Ste. 900
Los Angeles, CA 90067
Tel: (310) 228-6900
Fax: (310) 228-6939

William Melvin III
Liquid Asset Partners, LLC
4060 29th Street
Grand Rapids, MI 49512
Tel: (616) 450-0691
Fax: (616) 719-5918

{00086599.DOC; 2}

Mark Hostak
Joerns Healthcare Operating, LLC
5001 Joerns Drive
Stevens Point, WI 54481
Tel: (704) 846-7957
Fax: (715) 342-7339

With copy to: Patrick C. Maxcy, Esq.
Sonnenschein Nath & Rosenthal LLP
233 South Wacker Drive, Ste. 7800
Chicago, IL 60606-6404
Tel.: (312) 876-8000
Fax: (312) 876-7934

Robert A. Boghosian, Esq.
Cohen Tauber Spievack & Wagner P.C.
420 Lexington Avenue, Suite 2400
New York, NY 10170
Tel: (212) 381-8726
Fax: (212) 586-5095

Gerald P. Kennedy, Esq.
Procipio, Cory, Hargreaves & Savitch LLP
525 B Street – Suite 2200
San Diego, CA 92101
Tel: (619) 515-3239
Fax: (619) 398-0139

8.4     <u>Section and Other Headings</u>.   Section or other headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

8.5     <u>Exhibits</u>.   Each exhibit attached hereto shall be deemed to be a part of this Agreement to the same extent as if set forth verbatim in the body of this Agreement.

8.6     <u>Enforcement</u>.   The laws of the State of Delaware shall govern the interpretation, validity, performance and enforcement of this Agreement.  If any provision of this Agreement should be held to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this Agreement shall not be affected thereby.  So long as the Bankruptcy Case remains open, the parties may enforce this Agreement in the Bankruptcy Court and consent to the Bankruptcy Court's jurisdiction with respect to all such matters.

8.7     <u>Parties; No Third Party Beneficiaries</u>.   This Agreement shall be binding upon and enforceable against, and shall inure solely to the benefit of, the parties hereto and their respective successors and assigns.  Nothing herein shall confer any rights or remedies to any person or entity which is not a party hereto.  This Agreement and the Sale Order contain the entire

{00086599.DOC; 2}

understanding of the parties with respect to the subject matter thereof and supersede any prior communication or agreement with respect thereto.

8.8    Counterparts. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Agreement by signing any such counterpart.

8.9    Facsimile Signature. This Agreement may be executed and accepted by facsimile signature and any such signature shall be of the same force and effect as an original signature.

8.10    Further Assurances. Sellers and Buyer will execute such further documentation or take such further actions as the other party may reasonably request to effectuate the transfer of the Assets and implement this Agreement.

8.11    Access to Books and Records. Buyer agrees that, after the Closing Date and until the Sellers' Bankruptcy Cases are closed, that Buyer shall grant reasonable access to the Committee, Sellers, any subsequently appointed liquidating trustee and/or Chapter 11 or 7 trustee and their respective representatives to the pre-Closing Date books and records of Sellers (including electronically stored books and records) acquired by Buyer from Sellers pursuant to this Agreement, including making extracts and copies of such books and records as reasonably necessary, solely for the purpose of closing the Sellers Bankruptcy Cases, but such access shall not be available to the extent Buyer believes any of such books or records (including electronically stored books and records), or any information contained therein, may be used to the detriment of Buyer or any of its direct or indirect parent companies or affiliates. Any such access shall be granted during regular business hours upon reasonable advance notice and only to the extent such access does not interfere with the business and operations of Buyer. The Buyers shall have unfettered access to all books and records in order to extract Assets and information relating to the Assets; provided that they may not destroy or alter such information. Thereafter, the parties agree to cooperate with one another to permit the Debtors and the Committee, or a subsequently appointed chapter 7 trustee or chapter 11 trustee or a liquidating trustee access to these books and records in furtherance of their fiduciary duties.

**[Signatures on following page.]**

{00086599.DOC; 2}

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**BUYER**

**HPC3 FURNITURE HOLDINGS, LLC**

By: _____
Name: _Michael Fourticq, Jr._____
Title: _Manager_____

**LIQUID ASSET PARTNERS, LLC**

By: _____
Name: _____
Title: _____

**JOERNS HEALTHCARE OPERATING, LLC**

By: _____
Name: _____
Title: _____

**SELLERS**

**BARCALOUNGER CORPORATION**

By:_____
Name: Mr. John Chapman
Title: Chief Restructuring Officer

**-- and --**

**AMERICAN OF MARTINSVILLE, INC.**

By:_____
Name: Mr. John Chapman
Title: Chief Restructuring Officer

14

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**BUYER**

HPC3 FURNITURE HOLDINGS, LLC

By: _____

Name: _____

Title: _____

LIQUID ASSET PARTNERS, LLC

By: _____

Name: _William Melvin III_____

Title: _CEO_____

JOERNS HEALTHCARE OPERATING, LLC

By: _____

Name: _____

Title: _____

**SELLERS**

BARCALOUNGER CORPORATION

By:_____

Name: Mr. John Chapman

Title: Chief Restructuring Officer

– and –

AMERICAN OF MARTINSVILLE, INC.

By:_____

Name: Mr. John Chapman

Title: Chief Restructuring Officer

14

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**BUYER**

HPC3 FURNITURE HOLDINGS, LLC

By: _____
Name: _____
Title: _____

LIQUID ASSET PARTNERS, LLC

By: _____
Name: _____
Title: _____

JOERNS HEALTHCARE OPERATING, LLC

By: _*Mark Ludwig (signature)*_
Name: _MARK LUDWIG_
Title: _PRESIDENT & CEO_

**SELLERS**

BARCALOUNGER CORPORATION

By:_____
Name: Mr. John Chapman
Title: Chief Restructuring Officer

**-- and --**

AMERICAN OF MARTINSVILLE, INC.

By:_____
Name: Mr. John Chapman
Title: Chief Restructuring Officer

14

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**BUYER**

HPC3 FURNITURE HOLDINGS, LLC

By: _____
Name: _____
Title: _____

LIQUID ASSET PARTNERS, LLC

By: _____
Name: _____
Title: _____

JOERNS HEALTHCARE OPERATING, LLC

By: _____
Name: _____
Title: _____

**SELLERS**

BARCALOUNGER CORPORATION

By: *John Chapman*
Name: Mr. John Chapman
Title: Chief Restructuring Officer

**-- and --**

AMERICAN OF MARTINSVILLE, INC.

By: *John Chapman*
Name: Mr. John Chapman
Title: Chief Restructuring Officer

14

## Exhibit 1.1(a)

A. All Intellectual Property (as defined in the Agreement) owned by Barcalounger Corporation related to the business of Barcalounger Corporation, including, without limitation, patents, copyrights, samples, customer and CAD files, trade names, trade secrets, domain names, licenses, trademarks, designs, drawings, and electronic files and printed documents, including, without limitation, the following:

The following trademarks registered with the United States Patent and Trademark Office:

| Trademark | Registration No. | Filing Date |
|---|---|---|
| Barcalounger | 73161431 / 1116068 | 4/3/1979 |
| Wayne Phillips Furniture | 76457248 / 2851667 | 6/8/2004 |

B. All rights of Debtors to claims arising from federal "Anti-Dumping" laws.

C. All intellectual property owned by either American of Martinsville, Inc. or Barcalounger Corporation relating to the business of American of Martinsville, Inc., including, without limitation, patents, copyrights, samples, customers and CAD files, trade names, trade secrets and trademarks, and electronic files and printed documents, which relate to and are useful in operating the American of Martinsville, Inc. business, including, without limitation, the following:

Licenses, Patents, Copyrights,
Trademarks and Tradenames

1. All American of Martinsville Intellectual Property.

2. Some examples Included:

A. Domain names:

    a.   www.americanofmartinsville.com
    b.   www.americanofmartinsville.org

B. Trademark and Service Mark Applications/Registrations

| Country | Mark | Application No. | Registration No. | Goods / Services | Status |
|---|---|---|---|---|---|
| China | AMERICAN OF MARTINSVILLE and Design | 9800114176 | N/A | Furniture (Class 20) | Filed 09-Oct-98 |
| China | MARTINSVILLE | 9800020215 | 1282889 | Furniture, namely furniture of metal, office furniture; wall ornamentation, not of textile (furniture); decorative wall | Registered 14-Jun-99 |

15

{00086599.DOC; 2}

| | | | | plaques, not of textile (furniture); beds, tables, dressing tables, writing desks, sofas (Class 20) | |
|---|---|---|---|---|---|
| El Salvador | AMERICAN OF MARTINSVILLE | 335698 | 6 Book 111 | Furniture (Class 20) | Registered 24-Jul-00 |
| Guatemala | AMERICAN OF MARTINSVILLE | 199804616 | 98931 | Furniture (Class 20) | Registered 22-Sep-99 |
| Japan | AMERICAN OF MARTINSVILLE | 145952/92 | 3022759 | Furniture (Class 20) | Registered 28-Feb-95 |
| USA | AMERICAN OF MARTINSVILLE | 73/018,498 | 1,042,916 | Bedroom, dining room and living room furniture for homes, hotels, motels and other commercial establishments (Class 20) | Registered 06-Jul-76 |
| USA | AMERICAN OF MARTINSVILLE | 74/196,873 | 1,772,375 | Furniture (Class 20) | Registered 18-May-9 |
| USA | AMERICAN OF MARTINSVILLE | 73/018,497 | 1,044,876 | Bedroom, dining room and living room furniture for homes, hotels, motels and other commercial establishments (Class 20) | Registered 27-Jul-76 |
| USA | AMERICAN OF MARTINSVILLE HANDCRAFTED UPHOLSTERY | 73/396,182 | 1,269,232 | Bedroom, dining room and living room furniture for homes, hotels, motels and other commercial establishments (Class 20) | Registered 06-Mar-8 |

Patents

| Title | Patent No. | Issue Date | Application No. |
|---|---|---|---|
| Desk | D497,742 | 11/02/2004 | 29/190,435 |
| Furniture Panel | D514,849 | 02/14/2006 | 29/190,441 |
| Desk Top | D500,220 | 12/28/2004 | 29/190,489 |
| Armoire | D499,579 | 12/14/2004 | 29/190,490 |
| Armoire | D509,681 | 09/20/2005 | 29/202,944 |
| Headboard | D507,912 | 08/02/2005 | 29/202,945 |
| Dresser | D506,326 | 06/21/2005 | 29/202,946 |
| Louvered Top Molding for Furniture | | Pending | 29/202,915 (filed 4/7/2004) |
| Lockable Furniture Article For Storage of Personal Items | 6,736,468 | 05/18/2004 | 10/330,452 |

| MARK | SERIAL NO. | FILING DATE | REGISTRATION NO. | REGISTRATION DATE |
|---|---|---|---|---|
| AOM STUDIOS | 77/399,970 | 2/19/2008 | 3,568,508 | 1/27/2009 |
| AMERICAN OF MARTINSVILLE | 77/399,966 | 2/19/2008 | 3,568,507 | 1/27/2009 |
| AMERICAN OF | 74/196,873 | 8/22/1991 | 1,772,375 | 5/18/1993 |

16

| MARTINSVILLE | | | | |
|---|---|---|---|---|
| AMERICAN OF MARTINSVILLE | 73/018,497 | 4/11/1974 | 1,044,876 | 7/27/1976 |

| PATENT TITLE | U.S. PATENT NO. | ISSUE DATE | APP. SERIAL NO. | FILING DATE |
|---|---|---|---|---|
| LOCKABLE FURNITURE ARTICLE FOR STORAGE OF PERSONAL ITEMS | 6,736,468 | 5/18/2004 | 10/330,452 | 12/27/2002 |
| DESK | D497,742 | 11/2/2004 | 29/190,435 | 9/22/2003 |
| ARMOIRE | D499,579 | 12/14/2004 | 29/190,490 | 9/22/2003 |
| DESK TOP | D500,220 | 12/28/2004 | 29/190,489 | 9/22/2003 |
| DRESSER | D506,326 | 6/21/2005 | 29/202,946 | 4/7/2004 |
| HEADBOARD | D507,912 | 8/2/2005 | 29/202,945 | 4/7/2004 |
| ARMOIRE | D509,681 | 9/20/2005 | 29/202,944 | 4/7/2004 |
| FURNITURE PANEL | D514,849 | 2/14/2006 | 29/190,441 | 9/22/2003 |

**American of Martinsville IP**

| Item | Location |
|---|---|
| AOM Literature | Office- Advertising |
| AOM (Binders) | Office-Cubicle |
| AOM (Fabric Cards) | Office-Cubicle |
| AOM Historical Photos | Office-Near Advertising |
| AOM Fabric Samples - Healthcare | Office-Advertising |
| AOM Wood Finish Chips - Healthcare | Office-Showroom |
| Casegood Samples - Healthcare | Office- Front Area |
| Upholstery Samples - Healthcare | Office-Front Area |
| Casegoods Samples - Healthcare | Office-Upstairs |
| Upholstery Samples - Healthcare | Office-Front Area |
| Solution Design Files 12mos | Office-Solution Design M. Talbott, Etc. |
| Sourcing Files | Office/Rhonda Akers/Mike Padgen Files |
| Master Old AOM Catalogs | Office-Customer Service |
| Order Files-12mos | Office-Customer Service |
| Marketing T. Show Booth PopUP | Office- Upstairs Office, Closet |
| Website | Hancock Park Server-Ekta Chopra |
| Website Search Names | |
| AOM Telephone #, Fax# | |
| Engineering Product Photos | AOM Server |
| Customer Files | Microsoft AX |
| CAD Files | AOM Server |
| Routings/Specs | Microsoft AX |
| Purchasing Files | AX-Jeff Lee, etc. |
| Marketing/ Sales Files Photos,Etc. | Server-Nicole Fulcher Files |
| Historical Order Files | Microsoft AX |
| Testing Files BIFMA/CAL 133 | Office-Solution Design/Plant-Engineering |

{00086599.DOC; 2}

| Master Wood Frames Samples - Healthcare | Plant-Sample Shop |
|---|---|
| AOM Uph. Patterns | Plant-Cutting Area |
| Engineering/Protopype/Product Samples - Healthcare | Engineering/Sample Shop |
| AOM Trade Show Booth | Plant-Near Shipping |
| Master Wood Finish Panels | Finishing Room |

18

## Exhibit 1.1(b)

## [SELLER LOCATIONS]

128 E. Church Street
Martinsville, VA 24112


11 Redd Level Road
Martinsville, VA 24112

19